[Civ. No. 40111. First Dist., Div. Four. July 29, 1977.]

C. STARR et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents.

**COUNSEL**

G. T. S. Khalsa for Plaintiffs and Appellants.

Thomas M. O'Connor, City Attorney, Robert A. Kenealey, Deputy City Attorney, Tilden Edwards, Orrick, Herrington, Rowley & Sutcliffe, Richard C. Salladin, W. Reece Bader and Steven A. Brick for Defendants and Respondents.

**OPINION**

**EMERSON, J.**\*—Appellants herein are taxpayers of the City and County of San Francisco (hereafter referred to as the City). They sought

\*Retired judge of the superior court sitting under assignment by the Acting Chairman of the Judicial Council.

a declaratory judgment voiding two contracts between the City and the San Francisco Redevelopment Agency (hereafter the Agency). These contracts dealt with the construction and subsequent leasing of the Yerba Buena Center (hereafter YBC or the project). We shall refer to the contracts as the project lease and the repayment contract respectively. The trial court upheld the validity of both contracts and entered judgment in favor of the City. This appeal is from the judgment.

We conclude that the project lease is valid under the so-called *Offner-Dean* rule which we discuss below, but that the repayment contract violates the constitutional debt limitation provision of article XVI, section 18 of the California Constitution and is therefore void.

## FACTS

In 1966, the City's Board of Supervisors (hereafter the Board) adopted a redevelopment plan for an area known as the YBC project area. Thereafter, Louis Silver and other taxpayers brought a validation suit (Code Civ. Proc., §§ 860-870) alleging that the findings and determinations of the Board pursuant to California's Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.) were not supported by substantial evidence. In an unpublished opinion, the Court of Appeal affirmed a judgment of the trial court upholding the findings of the Board. (*Silver* v. *Board of Supervisors,* 1 Civ. 25233, filed May 13, 1969.) The plan was subsequently amended by ordinance in 1971 and 1973.

In 1973 the Board adopted an ordinance approving and authorizing the execution of a financing agreement between the City and the Agency. Pursuant to the amending ordinance passed that year, the plan in 1973 called for the Agency to issue bonds to finance the project consisting of three phases: (1) site acquisition, demolition and excavation; (2) erection of parking structures, a central heating and cooling plant and public facilities, including an exhibition hall; and (3) construction of a sports arena complex. The City would supervise all construction.

The financing agreement provided that "The Agency will execute a Project Lease and such supplemental leases as may be appropriate to the City and the City will rent from the Agency said completed Phase 1, Phase 2 and Phase 3 components or such other allocation of the Public Facilities as may be desirable at a time and at a rental, respectively, to be mutually agreed upon but which shall in any event be fully sufficient to amortize the outstanding bonds of the Agency. . . ." It also provided that

at a future date the City and the Agency would enter into a "repayment agreement" under which the Agency would provide for the use of tax allocation funds to offset lease payments owed by the City.

The Agency thereupon brought a validation action (Code Civ. Proc., § 860; Health & Saf. Code, § 33501) seeking an in rem validation of the ordinance authorizing execution of the financing agreement. (Redevelopment Agency of the City and County of San Francisco v. All Interested Persons, etc., San Francisco Sup. Ct. No. 667-945.) Service was made by publication, as provided for by statute, and, other than Alvin Duskin, no appearance was made by anyone challenging the validity of the agreement. Defaults against the other persons were taken on March 19, 1974. Defendant Duskin, on behalf of himself and other taxpayers, entered into a settlement agreement with the Agency, whereby plans for phase three, the sports arena complex, were dropped and the maximum amount of bonds to be issued by the Agency was reduced from $225 million to $210 million.

On March 31, 1975, the Board adopted ordinance Nos. 116-75 and 117-75 authorizing the City to enter into a project lease and to execute a repayment contract, both of which are the subject of this action.

The project lease provides that the Agency will issue bonds not to exceed $210 million for the purpose of raising money to provide for the carrying out of the project and construction of facilities for YBC and that the Agency will lease the project to the City. During the lease term, the City promises to pay the Agency (1) "Base Rental" consisting of $18,650,000 per year beginning on July 15, 1980, and (2) "Additional Rental" consisting of taxes and assessments on the property, all administrative costs of the Agency relating to the project and all premiums on insurance required by the lease. The City assumes responsibilities for all costs of maintenance and utilities. The lease further provides that no changes shall be made in the plans or specifications of the project unless approved in writing by the City and the Agency, and that "[b]efore giving such approval, the Agency may require the City to deposit with the Trustee [on behalf of the Agency] moneys sufficient to pay any increased costs resulting from such changes." At the end of the lease term, title to the project will vest in the City.

The repayment contract calls for the financing of the project through a special fund consisting of designated tax revenues and income derived

from the project. The trustee is directed to apply the funds to repay the indebtedness of the Agency to the United States Department of Housing and Urban Development (hereafter HUD) under its Loan and Capital Grant Contract, through which the Agency obtained funds to carry out the project. (See 42 U.S.C. § 1450 et seq.) However, the contract further provides: "If on May 1, 1980, sufficient moneys to fulfill the obligation of the Agency to HUD have not been deposited in such Special Fund, the City will take all steps and actions which it may lawfully so do to see that any deficiencies are timely met by the Agency and failing prompt payment by the Agency the City itself will promptly pay to the Special Fund any such deficiencies from whatever source or sources it may lawfully so do. . . ." The City and the Agency concede that the Agency's potential indebtedness under the HUD loan contract will be $14.1 million in 1980 and that the City can and will use ad valorem property taxes and other general funds to meet this obligation under the repayment contract. HUD is expressly declared to be a third party beneficiary of the City's promise. Upon discharge of the HUD obligation, all excess moneys paid into the fund shall be used to repay the City for all rental payments under the lease.

Additional facts will be given as they become pertinent.

### THE PROJECT LEASE

Article XVI, section 18 of the California Constitution provides in relevant part: "No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose. . . ."

Appellants maintain that the project lease does not constitute a valid lease, but in reality constitutes an agreement for the purchase and construction of public facilities.

The leading case on the distinction between a valid municipal lease and one which violates the constitutional debt limitation is *City of Los Angeles v. Offner* (1942) 19 Cal.2d 483 [122 P.2d 14]. There, a contractor agreed to build an incinerator on city-owned land which the city would lease to him for 10 years at a rental of $1 per month. He in turn would construct the incinerator and lease both the property and the incinerator back to the city for nine years and nine months at a specified monthly

rental. The city was given an option to buy the incinerator at various intervals during the term of the lease, but title to the incinerator remained in the contractor, who would remove it if the city's option was not exercised. In upholding the proposed contract as not violative of article XI, section 18 (predecessor to art. XVI, § 18), the Supreme Court stated the law as follows: "[I]f the lease or other agreement is entered into in good faith and creates no immediate indebtedness for the aggregate installments therein provided for but, on the contrary, confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year, no violence is done to the constitutional provision. [Citations.] If, however, the instrument creates a full and complete liability upon its execution, or if its designation as a 'lease' is a subterfuge and it is actually a conditional sales contract in which the 'rentals' are installment payments on the purchase price for the aggregate of which an immediate and present indebtedness or liability exceeding the constitutional limitation arises against the public entity, the contract is void." (*Id.,* at p. 486.)

Subsequently, in *Dean v. Kuchel* (1950) 35 Cal.2d 444 [218 P.2d 521], the court found that a similar lease which, instead of granting the public entity an option to buy, vested title in it at the end of the lease term did not convert the lease into a construction contract. The court did not see a legitimate distinction from the *Offner* case, since the essence of the *Offner* rule is simply that payments are for the month-to-month use of the building. (*Id.,* at p. 448.)

Both *Offner* and *Dean* quoted with approval the rule as formulated in *Garrett v. Swanton* (1932) 216 Cal. 220 [13 P.2d 725] (overruled in part on other grounds in *City of Oxnard v. Dale* (1955) 45 Cal.2d 729, 737 [290 P.2d 859]): "The rule as applied to each of these situations is well stated in *Garrett v. Swanton, supra,* at page 226, as follows: 'The law is well settled in this state that installment contracts of any kind, where the installment payments are to be made over a period of years and are to be paid out of the ordinary revenue and income of a city, *where each installment is not in payment of the consideration furnished that year,* and the total amount of said installments when coupled with the other expenditures exceeds the yearly income, are violative of the constitutional provision in question unless approved by a popular vote. This is so whether the contract be denominated a mortgage, lease, or conditional sale. . . . [C]ontracts for the furnishing of property in the future have been upheld, but only where no liability or indebtedness came into existence until the consideration was actually furnished. In other words,

such contracts are valid where each year's installment is within the city's income, and where each year's payment is for the consideration actually furnished that year.' " (*Offner, supra,* at p. 486; *Dean, supra,* at p. 477; Italics in original.)

In *County of Los Angeles* v. *Byram* (1951) 36 Cal.2d 694 [227 P.2d 4], the Supreme Court approved an agreement whereby the county retirement board constructed and leased to the county a courthouse building. The agreement required the county to pay $25,000 per month rent, plus taxes, insurance and maintenance for the premises. Once the board received its investment back plus interest, the lease could be terminated by either party. (*Id.,* at p. 696.) The court upheld the contract, not only because the obligation was not a true "debt" within the meaning of the debt limitation provision (because the county was under a statutory duty to provide court facilities), but because there was no "substantial distinction" between the subject agreement and that involved in *Offner* and *Dean.* Since then, other leases patterned substantially after *Byram* have been upheld. (See, e.g., *City of Montclair* v. *Donaldson* (1962) 205 Cal.App.2d 201 [22 Cal.Rptr. 842]; *McClain* v. *County of Alameda* (1962) 209 Cal.App.2d 73 [25 Cal.Rptr. 660]; *Lagiss* v. *County of Contra Costa* (1963) 223 Cal.App.2d 77 [35 Cal.Rptr. 450].)

■ Turning to the project lease and repayment contract here at issue, it initially appears that the lease by itself is in substantial compliance with the *Offner-Dean* rule: The base rental is for specified amounts to be paid by the City to the Agency "as rental for use and occupancy of the Project," with rent abatement provisions if the project is not substantially completed and ready for occupancy by July 15, 1980, or if there is a subsequent substantial interference with use and occupancy of the premises. The additional rental, consisting of payments for insurance, taxes and administrative costs are not uncommon concomitants of a lease and such payments, together with base rental, is recited to be "the fair rental value of the Project." In other words, the lease provides that each installment (rental payment) will be supported by consideration furnished that year, i.e., the occupancy and use of the project. This is the essence of the *Offner-Dean* rule.

We find nothing in the project lease which indicates that it is a "subterfuge." (See *Offner, supra.*) As noted above, the lease creates no immediate indebtedness for the aggregate installments therein provided for but, on the contrary, confines liability to each installment as it falls

due and each year's payment is for the consideration actually furnished that year.

The clause in the lease which provides that, if changes are made in plans or specifications of the project, the Agency may require the City to pay for all increased construction costs as the result of such changes, does not alter this conclusion. Such changes may not be made unless the City gives its written approval. If the City desires such changes in the facilities it intends to occupy, requiring it to pay for the increased cost in connection therewith cannot transform the entire lease into a construction contract. Rather, such a provision is comparable to one requiring a tenant who desires to make physical changes or alterations in the premises he intends to use to pay for such alterations. The lease as a whole does not violate the constitutional provision.

### THE REPAYMENT CONTRACT

The same cannot be said about the repayment contract, specifically that clause (hereafter the repayment clause) which requires the City to repay from its general funds that portion of outstanding indebtedness which the Agency may owe to HUD on May 1, 1980. It is immediately apparent that the payment due from the City to satisfy the Agency's liability in 1980 is unsupported by consideration. The contract itself does not designate such payments as "rentals" or as made in consideration for use and occupancy of the premises. Rather, the purpose of the repayment clause is recited to be that "the Agency and the City desire to assure HUD that the Agency's obligation under the Loan and Capital Grant Contract with the Agency will be met." The City and the Agency concede that none of the City's payments on the Agency's HUD indebtedness can be credited toward the City's rental obligations. In none of the *Offner-Dean* cases was municipal liability incurred other than in consideration for the use and occupancy of the premises. (See *Offner, supra,* at p. 487; *Dean, supra,* at pp. 447-448; *Byram, supra,* at p. 696.)

Further, contrary to the strictures of the *Offner-Dean* rule that the lease create an indebtedness only for each installment of rent as it falls due, the effect of the repayment clause is to create an aggregate indebtedness on the part of the City above and beyond yearly rental payments. The constitutional debt limitation provision was enacted "to prevent the improvident creation of inordinate debts which might be charged against taxpayers in ever increasing volume from year

to year." (*Lagiss* v. *County of Contra Costa, supra,* 223 Cal.App.2d 77, 85; cf. *McBean* v. *City of Fresno* (1896) 112 Cal. 159, 164 [44 P. 358].) "Each year's income and revenue must pay each year's indebtedness and liability, and no indebtedness or liability incurred in one year shall be paid out of the income or revenue of any future year." (*McBean, supra,* at p. 164.) The constitutional provision is there to insure that "every separate payment is supported by its own consideration and . . . falls within the budgetary allotment provided for that year. . . ." (*County of Sacramento* v. *Assessment Appeals Bd. No. 2* (1973) 32 Cal.App.3d 654, 668 [108 Cal.Rptr. 434].) ▮ The repayment clause violates the above principles: It creates a municipal indebtedness in 1975 (the execution date of the repayment contract) to be paid out of the City's general funds in 1980, regardless of the expenditures allotted for that year and regardless of the revenue generated by the special fund which is to finance the project.

By creating a future charge on the City's general funds over and above the special fund, the repayment clause is precisely that form of municipal liability proscribed in *City of Palm Springs* v. *Ringwald* (1959) 52 Cal.2d 620 [342 P.2d 898]. In *Ringwald,* the City issued bonds to pay for improvements of parking facilities and set up a special fund to pay for the bonds, consisting of not only revenue from parking facilities and meters, but also future general fund revenue from the city's sales and use taxes. (*Id.,* at p. 622.) The Supreme Court held that, in the absence of a two-thirds vote by the electorate, the pledge of sales and use taxes to pay for the bonds violated California's constitutional debt limitation provision. In the instant case, the City has set up a special fund in order to meet its obligations under the project lease and repayment contract, but concedes that it can and will resort to its general funds, including ad valorem property taxes, to satisfy its potential $14 million obligation under the repayment clause. The Supreme Court held in *Ringwald* that for an indebtedness payable out of a "special fund" to be exempt from the constitutional debt limitation, the city must *not* be obligated to satisfy the indebtedness out of its general funds or by exercise of its powers of taxation, should the special fund prove insufficient. (*Id.,* at p. 626, citing *City of Oxnard* v. *Dale, supra,* 45 Cal.2d 729, 733.) The court stated: ". . . payments into the special fund beyond the current year, that is, payments in futuro, cannot be a charge upon the general fund; rather, the revenue must be supplied by the agency to be benefited. [¶] In each case upholding the special fund doctrine, the payments pledged to be paid into the special fund have been from the revenue of the particular project to be benefited or the district or agency of which the project was

to become a part." (52 Cal.2d at p. 624.) Since the City of Palm Springs' sales and use taxes constituted general revenue, an in futuro pledge of such revenue was invalid. The court concluded that "The constitutional provision does not prohibit the legislative body of the city from spending any or all of its *current* income for whatever it deems proper or necessary objects of public convenience or welfare. It simply provides that *the legislative body may not encumber the general funds of the city beyond the year's income without first obtaining the consent of two thirds of the electorate.*" (52 Cal.2d at p. 627, italics added.) The City's in futuro encumbrance of its general funds in the present case is indistinguishable from that undertaken in *Ringwald.* In both cases the municipality is committing its general funds to a future indebtedness over and above the "income and revenue provided for such year." (Cal. Const., art. XVI, § 18.) California cases make it clear that the purpose of the constitutional provision is to ensure that the legislative body of a municipality not be allowed to impose upon the general revenue of the city a long-term indebtedness, without approval by two-thirds of the electorate. It is precisely such an indebtedness which is created by the repayment clause.

Respondents contend that "appellants introduced *no evidence* tending to show that the amount of respondent City's obligation under section 3.01 [the repayment clause] exceeded its income and revenues in fiscal year 1974-1975. Nor did appellants introduce any evidence to show that respondent City's obligation, if any, would exceed its revenues and income for fiscal year 1979-1980," (italics in original) and thus no violation of article XVI, section 18 has been shown. However, this argument ignores the fundamental principle that it is the future encumbrance of the City's general fund beyond the year in which income is received which alone violates the constitutional provision. (See *City of Palm Springs* v. *Ringwald, supra,* 52 Cal.2d 620, 626.) Therefore, whether or not the City may or may not have sufficient moneys in the general fund to repay the HUD obligation in 1980 cannot alter the fact that the City's pledge of general fund revenue beyond the year in which that revenue is received establishes a violation of the constitutional debt limitation.

Respondents attempt to avoid the foregoing conclusions by arguing that this is not a "Special Fund" case, but a "lease revenue" case, in the spirit of *Offner* and *Dean.* Since "lease revenue" cases are based on the premise that the City will use its general fund to pay the rentals, the City's commitment to its general fund here is argued to be valid. This argument ignores the fact that these "lease revenue" cases are also based

on the premise that each year's allotment of city funds will be supported by its own consideration—i.e., use and occupancy of the premises. The repayment clause, on the other hand, creates a future charge against general funds that is not supported by consideration and cannot be included in the City's yearly budgetary allocations. ■ California courts have recognized that *any* obligation which creates a liability upon the general funds of a City beyond the year in which funds are received, is violative of the constitutional limitation unless approved by popular vote. (*City of Montclair* v. *Donaldson, supra,* 205 Cal.App.2d 204-205; *City of Palm Springs* v. *Ringwald, supra,* 52 Cal.2d 620, 626; *City of Oxnard* v. *Dale, supra,* 45 Cal.2d 729, 733.)

The City attempts to justify the HUD obligation as a legitimate concomitant of a lease by pointing out that in the *Offner-Dean* line of cases, leases were upheld which included provisions requiring the municipality to pay, in addition to periodic rentals, costs such as taxes, special assessments, insurance and maintenance. However, such charges are common terms of a lease agreement, comprising as they do part of the fair consideration for the use and occupancy of the premises. In contrast, the City's potential $14 million obligation in 1980 under the repayment clause herein is neither recited to be part of the consideration for use and occupancy of the premises that year, nor can it reasonably be so interpreted. Furthermore, while charges for taxes, maintenance and insurance are easily capable of estimation so that the municipality may make budgetary provisions for them in its yearly appropriations, the HUD obligation creates a lump sum indebtedness of unknown proportions. As the Supreme Court has stated, one of the purposes of the two-thirds voting requirement is: ". . . *to safeguard the general funds* and property of a municipality from a situation whereby the holders of an issue of bonds could, at some time after the issuance thereof, force an unconsented-to increase in the taxes of, or foreclose on the general assets and property of the issuing public corporation to obtain payment of the principal and interest thereon." (*City of Redondo Beach* v. *Taxpayers, Property Owners, etc., City of Redondo Beach* (1960) 54 Cal.2d 126, 131 [5 Cal.Rptr. 10, 352 P.2d 170], italics added.) An analogous situation is presented here. The obligation imposed upon the City by the repayment clause could force an unconsented-to increase in taxes to make up for the deficit encountered as the result of the City's status as guarantor of the Agency's HUD loan.

■ In sum, we conclude that the repayment contract violates the constitutional debt limitation because it contravenes the *Offner-Dean*

requirement that each year's payment be supported by consideration furnished that year, and because the City's in futuro commitment of its general funds to repay the Agency's HUD obligation in the absence of a two-thirds vote of the electorate creates an illegal indebtedness as articulated by the Supreme Court in *City of Palm Springs* v. *Ringwald, supra.* For these reasons, the judgment of the trial court in favor of respondents as to the repayment contract is incorrect and must be reversed.

## RES JUDICATA

Appellants claim that the project lease and repayment contract are invalid, not only because of the City's violation of the constitutional debt limitation, but because the City's approval of the contracts was not accompanied by new findings of economic feasibility in accordance with California's Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.). They contend that since 1966, when the YBC project was originally found to be feasible, the scope of the project has changed so drastically that a new finding is now required. Respondents, on the other hand, contend that the judgment should be affirmed in its entirety based upon the judgment in Redevelopment Agency of the City and County of San Francisco v. All Persons Interested, etc., *supra,* (Sup. Ct. No. 667-945) and Code of Civil Procedure. section 870, which provides that in a validation action by a public agency, "The judgment, if no appeal is taken . . . shall . . . thereupon become and thereafter be forever binding and conclusive, as to all matters therein adjudicated *or which at that time could have been adjudicated,* against the agency and against all other persons. . . ." (Italics added.) The gist of respondents' claim is that, since the All Persons case specifically validated the 1973 financing agreement entered into between the City and the Agency, and that since the project lease and repayment contract are merely implementations of the financing agreement, the default judgments taken against all persons preclude appellants from challenging the validity of the repayment contract and project lease under the doctrine of res judicata.

There is no question that the All Persons action was a properly instituted validation proceeding pursuant to Code of Civil Procedure section 860 et seq., and that appellants are bound by the judgment in that proceeding. The decisive question is whether the issues herein sought to be raised by appellants are matters which "at that time could have been adjudicated." (Code Civ. Proc., § 870.)

Respondents argue that both the debt limitation issue and the "economic feasibility" issue were impliedly raised by the financing agreement. The court's judgment in All Persons, decreeing that the provisions of the financing agreement "were and are in conformity with the provisions of all laws ·and enactments at any time in force or controlling . . . and were and are in conformity with all requirements of all regulatory bodies, agencies or officials having authority over . . . said proceedings" according to respondents, effectively precludes further attack upon the project lease and repayment contract made pursuant to the financing agreement.

With respect to the debt limitation issue, we conclude that the repayment contract and project lease entered into ostensibly "pursuant to" the financing agreement contain terms so new and materially different from the agreement, that the issue of the City's violation of the constitutional debt limitation could not possibly have been adjudicated at the time of the All Persons case. The financing agreement, the validity of which was established in All Persons, simply provides that "The Agency will execute a Project Lease and such supplemental leases as may be appropriate to the City and the City will rent from the Agency said completed . . . components or such other allocation of the Public Facilities as may be desirable at a time and at a rental, respectively, to be mutually agreed upon but which shall in any event be fully sufficient to amortize the outstanding bonds of the Agency together with additional rentals to cover any incidental additional expenses. . . ." It also states that the parties will enter into a repayment agreement, but only for the purpose of providing for "payment to the City of all such tax allocations to offset lease rental payments. . . ." No mention is made of the HUD obligation. By itself, the financing agreement is in full harmony with the *Offner-Dean* rule permitting a municipality to rent facilities from a developer where each yearly payment is supported by consideration, i.e., use and occupancy. But the repayment contract, subsequently entered into, contains the crucial repayment clause which makes the City liable for an Agency obligation totally unrelated to rentals and unsupported by *consideration*

■ The financing agreement and settlement agreement which were validated by the court in the 1974 All Persons action contain no hint of the provisions which are violative of the constitutional debt limitation, and which were added in 1975. Under well settled law, the doctrine of res judicata does not apply where there are changed conditions and new facts which were not in existence at the time of the prior judgment, and

upon which such judgment was based. (*McGaffey* v. *Sudowitz* (1961) 189 Cal.App.2d 215, 218 [10 Cal.Rptr. 862]; *People* v. *Ocean Shore Railroad* (1948) 32 Cal.2d 406, 418 [196 P.2d 570, 6 A.L.R.2d 1179].) Clearly, the repayment clause constitutes a changed condition of the project agreement between the City and the Agency. It is precisely this new fact or condition which is the object of controversy as to the debt limitation issue. Hence, we find that such issue could not have been adjudicated at the time of the prior action and that appellants are not thereby prevented from raising it under Code of Civil Procedure section 870 or the doctrine of res judicata.

■ The issue of feasibility findings, however, presents a different problem. Appellants' main contention is that it was the addition of a convention center complex to the project which required a new finding of economic feasibility. The financing agreement validated in All Persons specifically called for the construction of an exhibition hall, and the issuance of up to $225 million in Agency bonds to finance the entire project. Thus by 1973, the Board had amended the redevelopment plan so as to encompass the construction of a convention hall; any challenge asserting that a new finding of economic feasibility was necessary, could have then been made. Unlike the HUD obligation's effect on the debt limitation issue, sufficient facts and circumstances with respect to the enlargement of the original redevelopment plan existed at the time of the All Persons suit, so that the issue of whether new findings for the plan were required *could have been adjudicated at that time.* Therefore, under Code of Civil Procedure section 870, the validation of the financing agreement, containing plans for the enhanced scope of the project, precludes appellants from contending herein that the enlargement of the project mandates new findings of economic feasibility.

The judgment is reversed with directions to the trial court to enter a new judgment in accordance with the views expressed herein.

Rattigan, Acting P. J., and Christian, J., concurred.