Filed 4/4/25  Moving Oxnard Forward v. City of Oxnard CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| MOVING OXNARD FORWARD, INC., et al., | 2d Civ. Nos. B334636, B335866 |
| Plaintiffs and Appellants, | (Super. Ct. No. 56-2022-00573015-CU-JR-VTA) |
| v. | (Ventura County) |
| CITY OF OXNARD et al., | |
| Defendants and Respondents; | |
| OXNARD COMMUNITY DEVELOPMENT COMMISSION SUCCESSOR AGENCY et al., | |
| Real Parties in Interest. | |

The City of Oxnard (the City) and two other public agencies entered into a joint powers agreement to create the City of Oxnard Financing Authority (Financing Authority) (collectively Respondents).  The City and Financing Authority later approved

two lease revenue bonds to finance public capital improvements. Appellants Moving Oxnard Forward, Inc. and Aaron Starr (collectively Appellants)[1] brought a reverse validation action (Code Civ. Proc., § 860 et seq.) to challenge the approval of these bonds. Among other things, they contend the bonds violate constitutional debt limits imposed by article XVI, section 18 of the California Constitution. The trial court ruled in favor of Respondents. Appellants appeal from the judgment. We affirm.

FACTS AND PROCEDURAL HISTORY

The Joint Exercise of Powers Act (Gov. Code,[2] § 6500 et seq.) (the Act) "provides a means by which governmental agencies may join together to accomplish goals that they could not accomplish alone, or that they might more efficiently and more effectively accomplish together." (*Robings v. Santa Monica Mountains Conservancy* (2010) 188 Cal.App.4th 952, 962.) Under the Act, two or more public entities may enter into a joint powers agreement to create a joint powers authority, which is a separate entity vested with the power to exercise powers common to the contracting parties and also those conferred by state law. (§§ 6502, 6503.5, 6507-6508; 6547; (*Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1050-1054 (*Rider*).)

In 1991, the City, the Oxnard Community Development Commission (as successor to the Redevelopment Agency of the City of Oxnard), and the Housing Authority of the City of Oxnard

---

[1] Moving Oxnard Forward is a nonprofit organization representing citizens of Oxnard, and Starr is a resident of Oxnard.

[2] Further unspecified statutory references are to the Government Code.

entered into a joint powers agreement to create the Financing Authority pursuant to the Act (§ 6500 et seq.). The Financing Authority was created "to finance the cost of any capital improvement, working capital, or liability and other insurance needs, or projects wherever there are significant public benefits, as determined by the City." As a joint powers authority, the Financing Authority can issue revenue bonds to finance public capital improvements. (§§ 6546, 6547, 6584-6599.3.)

In 2022, the City held a noticed public hearing regarding the approval of the Financing Authority's issuance of two lease revenue bonds: the City of Oxnard Public Financing Authority Lease Revenue Bonds, Series 2022A and 2022B. The bonds would finance street improvements within the city and software upgrades to the City's enterprise resource planning system (business management software system).

The 2022A and 2022B Bond Series financing was based on a lease-leaseback arrangement. The City would lease certain properties to the Financing Authority for a nominal amount. The Financing Authority, in turn, would sublease the properties back to the City in exchange for payments to cover the annual debt on the bonds (debt service), and additional payments, including insurance, taxes, and other administrative expenses.

Appellants attended the public hearing and opposed the approval of the bonds. The City adopted Resolution No. 56 and the Financing Authority adopted Resolution No. 15,638 (collectively the Resolutions). The Resolutions approved and authorized the Financing Authority's issuance of the Bond Series 2022A and 2022B, not to exceed $36,000,000 and $9,000,000, respectively.

Appellants filed a complaint and petition for a writ of mandate/administrative mandamus seeking to invalidate the

3

Resolutions. They argued the bonds violated constitutional debt limits under article XVI, section 18 of the California Constitution because the City failed to obtain a two-thirds vote of the electorate. They also argued the City failed to comply with the procedural requirements of the Act.

Following a hearing in December 2023, the trial court issued a tentative statement of decision finding in favor of Respondents on the reverse validation cause of action.[3] Because it found the *Offner-Dean*[4] rule applied to the lease revenue bonds, the court concluded the City was not required to seek voter approval before authorizing them. The court also found Respondents complied with the Act in authorizing the bonds under the Resolutions. The court adopted its tentative decision and entered judgment in favor of Respondents.[5] We disagree.

## 1. Relevant background

To finance the Series 2022A and 2022B revenue bonds, the City and Financing Authority utilized the 2019 Facility Lease and 2019 Site Lease (2019 leases). The City and the Financing Authority previously entered into these leases for the issuance of

---

[3] The trial court dismissed the other two causes of action for writ of mandate/administrative mandamus and declaratory relief. It dismissed the former because appellants had "an adequate legal remedy in the form of a reverse validation action." It dismissed the latter because its "gist and effect" was the same as the reverse validation cause of action.

[4] *City of Los Angeles v. Offner* (1942) 19 Cal.2d 483 (*Offner*) and *Dean v. Kuchel* (1950) 35 Cal.2d 444.

[5] Appellants appealed the tentative decision in case number B334636, and later appealed the judgment in case number B335866. The two cases were consolidated.

prior bonds, the Lease Revenue Bonds, Series 2019A. Pursuant to the 2019 leases, the City leased real property to the Financing Authority pursuant to the 2019 Site Lease; the Financing Authority then subleased the property back to the City under the 2019 Facility Lease; and the Series 2019 bonds were secured by rental payments and additional payments for administrative costs and other fees. Base rental was equivalent to the debt service on the Series 2019A bond.

Under a section entitled "Rental Payments," the 2019 Facility Lease provides: "The City agrees to pay to the Authority . . . as rental for the use and occupancy of the Leased Property, the following amounts at the following times: [¶] (a) Base Rental. . . . the City shall pay to the Authority rental hereunder as Base Rental Payments for the use and occupancy of the Leased Property for each Lease Year or portion thereof . . . . [¶] . . . [¶] (b) Additional Payments. The City shall also pay in addition to the Base Rental Payments, to the Authority. . . in each year as shall be required for the payment of all costs and expenses incurred in connection with the execution, performance or enforcement of this Facility Lease . . . including but not limited to all fees, costs and expenses and all administrative costs of the Authority relating to the Leased Property including, . . . salaries and wages of employees, overhead, insurance premiums, taxes and assessments (if any), expenses . . . and all other reasonable and necessary administrative costs of the Authority. . . . [¶] . . . [¶] (c) Consideration. [¶] (i) Such payments of Base Rental Payments for each Lease Year . . . shall constitute, together with the Additional Payments, the total amount due for such Lease Year . . . and shall be paid . . . by the City for and in consideration of the right of the use and possession of, and the continued quiet use and enjoyment of, the Leased Property."

5

The Resolutions at issue in this appeal approved amendments to the 2019 Facility and Site Leases to fund the Series 2022A and 2022B revenue bonds.  The 2019 Facility Lease was amended to include additional real property and to increase the amount of base rental payments.  Thus, the terms and provisions of the amended facility lease was to "form part of the 2019 Facility lease," and the 2019 Facility lease would "continue in full force and effect in accordance with the terms and provisions thereof, as . . . amended and supplemented."  And pursuant to these terms, the City would pay the Financing Authority base rental payments (in the amount equivalent to the principal and interest on the 2022 bonds) and additional payments, including administrative costs and insurance premiums, in exchange for use and occupation of the leased properties.

*2. Analysis*

In our view, the City's obligation to pay "additional payments" are not unconstitutional "long-term debt obligations." The amended facility lease defines "additional payments" as administrative costs and expenses, taxes, assessments, insurance premiums, and other such expenses associated with the leased property.  It also specifies, that the "payments of Base Rental Payments for each Lease Year . . . shall constitute, *together with the Additional Payments*" "consideration of the right of the use and possession of, and the continued quiet use and enjoyment of, the Leased Property."  (Italics added.)  Thus, the additional payments are contingent obligations that are paid (together with the base rent) in exchange for the City's use of the leased property.  And because the additional payments arise in the same fiscal year they are due and payable, the obligation to make these payments only arises when the City receives use and occupancy

6

of the leased property for the fiscal year.  (See *Offner*, *supra*, 19 Cal.2d at p. 486.)  The additional payments, along with the base rental payments, are also subject to abatement if there is substantial interference with the City's use and possession of the property.

Appellants nevertheless contend the additional payments are "impermissible payments obligated above-and-beyond the consideration of the lease values" received.  We are not persuaded.  Our Supreme Court in *Rider*, *supra*, 18 Cal.4th at pp. 1040, 1049, upheld the validity of a lease agreement which included similar additional payments as a part of the total payment that served as consideration under the terms of that agreement.  There, the City of San Diego agreed to cover all of the financing authority's obligations as they arose, which included "rent equal to the debt service on the bonds, including interest and principal, *and additional rent to cover the Financing Authority's administrative expenses*."  (*Id*. at p. 1040, italics added.)  And in *Starr v. City and County of San Francisco* (1977) 72 Cal.App.3d 164, 172 (*Starr*), the Court of Appeal recognized that additional payments for taxes and assessments, administrative costs, and insurance premiums were "not uncommon concomitants of a lease" and that "together with base rental, is recited to be 'the fair rental value of the Project.' "  We similarly conclude the additional payments at issue here are permissible.

Appellants compare this case to *Chester v. Carmichael* (1921) 187 Cal. 287, but that case is inapposite.  *Chester* involved a land conveyance to the City of Sacramento and an agreement to build and maintain a public park on the land as a condition of conveying title to the property.  Under the contract terms, the landowner would convey the land to the city with some

conditions, including that the city pay a minimum of $5,000 per year for the improvement of the park. (*Id*. at p. 289.) Our Supreme Court concluded the contract violated constitutional debt limits because the city entered a contract for purchase of the land, and the debt was created at the time the contract was entered. (*Id*. at p. 293.) As the court observed, "the full liability [of the city] to the grantors was created upon the acceptance of the deed." (*Id*. at p. 294.) Thus, the city's obligation to pay the minimum $5,000 per year was not contingent on anything once the city accepted the deed to the property. But here, the City's obligation to pay the additional payments is contingent upon delivery of continued use and occupancy of the property.

Appellants also rely on *Starr*, *supra*, 72 Cal.App.3d 164. But *Starr* is consistent with our conclusion. In *Starr*, the Court of Appeal considered the validity of two contracts—a project lease and "repayment contract"—between the City of San Francisco and the San Francisco Redevelopment Agency. (*Id*. at p. 168.) The project lease provided for the agency to issue bonds for financing the project and construction of facilities, and the agency would lease the project to the city in exchange for base rent and "additional rental" consisting of taxes, administrative costs, and insurance. (*Id*. at p. 169.) The repayment contract called for the creation of a special fund consisting of designated tax revenues and income derived from the project. (*Id*. at pp. 169-170.) The purpose of the special fund was to repay a loan incurred by the agency to the United States Department of Housing and Urban Development (HUD) to help finance the project. (*Id*. at p. 170.) The repayment contract further provided that at a certain date, if sufficient funds had not been deposited in the special fund to meet this obligation, the city would make up the deficit from whatever source it may lawfully use. (*Ibid*.)

*Starr* upheld the project lease, concluding that the lease was "in substantial compliance with the *Offner-Dean* rule." (*Starr, supra,* 72 Cal.App.3d at p. 172.) But the court concluded the repayment contract was invalid because it was not supported by consideration since the contract did not designate the city's payments to the HUD as " 'rentals' " exchanged for use and occupancy of the premises. (*Id.* at p. 173.) Moreover, the repayment contract created a debt when the contract was executed which the city would have to pay in the future out of its general funds. (*Id.* at p. 174.)

Appellants contend the additional payments here are akin to the invalid HUD payments in *Starr.* We disagree. The additional payments here are tied to the base rental payments and are consideration for the use and occupancy of the leased properties furnished in the same year. "This is the essence of the *Offner-Dean* rule." (*Starr, supra,* 72 Cal.App.3d at p. 172.) Nor do the additional payments create a future debt that the City is obligated to pay from general funds. They are like the "additional rental" required by the project lease upheld in *Starr.* (*Ibid.*)

Appellants also contend additional payments, including the City's obligation to pay "reserve funds," improperly guarantee future lease payments even if the City "loses the occupancy and use" of the leased properties. We are not persuaded.

Reserve funds are separate funds that serve as security for the debt service on the 2022 bonds, and such funds are a standard funding requirement for bond financing. They are another form of insurance. The reserve funds are initially funded during the issuance of the bonds from bond proceeds. They cover any missed lease payments and are not drawn upon unless the City misses a payment. If the City does not miss a lease

payment, it does not pay into the reserve fund after the initial funding. Only if there is a missed payment and the reserve fund is drawn would the City pay into the reserve fund. And because these payments from the reserve funds are due and payable immediately, they do not extend into future fiscal years.

To the extent appellants argue the City is guaranteeing payment in the event of abatement, we do not read the lease agreement to obligate the City to continue paying into the reserve fund when it loses all use and occupancy of the leased properties. Rental payments due, including base rental payments and additional payments, are "subject to complete or partial abatement . . . and to the extent there is substantial interference with the City's right to use and occupy the Leased Property or any portion thereof." We conclude that additional lease or rental payments to the reserve funds are not unconstitutional noncontingent obligations because they do not guarantee future payments irrespective of the City's use of the leased property.

*Requirement for measured fair market value*

Appellants also contend the lease-leaseback funding does not comply with the *Offner-Dean* rule because the City's base rental payments, equivalent to the principal and interest payments on the bonds, is not tied "to actual or reasonably measured market rental values." Again, we are not persuaded.

*Rider*, *supra*, 18 Cal.4th 1035, upheld a similar lease agreement. In *Rider* the City of San Diego agreed to pay rent "equal to the debt service on the bonds, including interest and principal, and additional rent to cover the Financing Authority's administrative expenses." (*Id*. at p. 1040.) The "City and the Port District . . . created a financing mechanism that matches as closely as possible (in practical effect, if not in form) a City-financed project, but avoids the two-thirds vote requirement."

10

(*Id*. at p. 1055.) Thus, the rental value was not based on any measurement of fair market value, but rather on the financing of the project.

Appellants contend *Rider*'s analysis of value was merely dicta. But even if it were dicta, a statement of the Supreme Court should be considered persuasive. (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169.) We follow it here.

In our view, the lease-leaseback funding arrangement does not run afoul of the *Offner-Dean* rule. The record reflects the City's annual rent to the Financing Authority intended to represent the fair rental value of the leased properties. The City evaluated several factors, including replacement costs of the leased property, to determine the fair rental value. The City determined the fair rental value was not less than the maximum base rental payments under the facility lease. And the City agreed that increases to the base rental payments would not exceed the annual fair rental value of the leased property.

*Significant public benefits under the Marks-Roos Act*

Appellants contend the Marks-Roos Act requires a hearing "to be held in which evidence was required to be taken." They contend no evidentiary hearing was held and that no evidence supports the City's finding of a significant public benefit. We again disagree.

Nothing in section 6586.5 nor any other provision in the Marks-Roos Act requires the local agency to hold a separate evidentiary hearing to make an evidentiary finding regarding a significant public benefit in order to finance public capital improvements.

Section 6586.5 provides several conditions to issue a bond for public capital improvements. The relevant condition here is that the local agency "has approved the financing of the public

11

capital improvement and made a finding of significant public benefit in accordance with the criteria specified in Section 6586 after a public hearing held by that local agency." (§ 6586.5, subd. (a)(2).) This condition was met. After a public hearing and "based on information provided to [it]" by staff and financial consultants, the City found that the issuance of the 2022 bonds would yield "demonstrable savings in bond preparation, bond underwriting and bond issuance costs, and employment benefits from undertaking the project in a timely fashion."

Appellants do not show the City's approval of the bonds was "arbitrary, capricious, or entirely lacking in evidentiary support." (*Poway Royal Mobilehome Owners Assn. v. City of Poway* (2007) 149 Cal.App.4th 1460, 1479.) The record reflects the City's financial advisors identified and notified the City that it needed $30 million for road repair and $8 million to finance software upgrades. As a way to promptly fund the road repairs and implement the next phases of the software upgrade, the City's financial advisors proposed the issuance of the 2022 bonds, utilizing the 2019 bonds structure, which allowed for pooling of the leased properties to provide security for the 2022 bonds.

The City's chief financial officer identified a strategic priority of the 2022 bonds funding was to "minimize the impact to the General Fund over the next 10-15 years." The bond funding would allow the City to obtain upfront funding for roadwork and the software upgrades, instead of conducting the work piecemeal at potentially higher costs. It would also allow the City to avoid deferring road repairs until funding is available and/or avoid using the general fund. The City could have rationally concluded that the lease-leaseback funding structure would minimize the impact on the general fund while allowing the street improvements and software upgrades to move forward

12

expeditiously.  (See *Rider*, *supra*, 18 Cal.4th at p. 1047 [multi-year lease contracts allow local governments to avoid price volatility from year to year and to negotiate lower prices overall].)  Based on this record, we will not disturb the approval of the two lease revenue bonds.

DISPOSITION

The judgment is affirmed.  Respondents shall recover costs on appeal.

NOT TO BE PUBLISHED.

BALTODANO, J.

We concur:

GILBERT, P. J.

CODY, J.

Mark S. Borrell, Judge

Superior Court County of Ventura

_____

Craig A. Sherman for Plaintiffs and Appellants.

Best Best & Krieger, Scott W. Ditfurth and Andrew G. Saghian for Defendants, Respondents, and Real Parties in Interest.