[No. E038366. Fourth Dist., Div. Two. July 26, 2007.]

FONTANA REDEVELOPMENT AGENCY, Plaintiff and Respondent, v. JEANETTE TORRES et al., Defendants and Appellants; TEN-NINETY, LTD., Defendant and Respondent.

■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■

## Counsel

Western Center on Law & Poverty, Deanna R. Kitamura, Richard Rothschild, Greg Spiegel, Lynn Martinez; Michael Rawson, Deborah Collins; Inland Counties Legal Services, Robert S. Roddick, C. Cass Watters; Briggs Law Corporation and Cory J. Briggs for Defendants and Appellants.

Kirkland & Ellis, Jeffrey S. Davidson, Eric W. Hagen, Mark T. Cramer; and John C. Eastman for The Claremont Institute Center for Constitutional Jurisprudence as Amicus Curiae on behalf of Defendants and Appellants.

Best Best & Krieger, Victor L. Wolf, Kevin K. Randolph and Danielle G. Sakai for Plaintiff and Respondent.

Mahoney Coppenrath & Jaffee, Pachulski Stang Ziehl Young Jones & Weintraub, James E. Mahoney, Daryl G. Parker; McDonough Holland & Allen, Joseph E. Coomes, Jr., and Richard E. Brandt for Defendant and Respondent.

## Opinion

## GAUT, J.—

### 1. Introduction[1]

The present appeal concerns the Fontana Redevelopment Agency (Fontana RDA) and the implementation of its redevelopment plan, particularly as it affects its statutory obligation to increase the supply of affordable housing as part of redevelopment. (§ 33071; *Lancaster Redevelopment Agency v. Dibley* (1993) 20 Cal.App.4th 1656, 1658–1659 [25 Cal.Rptr.2d 593] (*Lancaster*).) Ten-Ninety, Ltd., a California limited partnership, the real estate developer of Fontana's Jurupa Hills Redevelopment Project and a real party in interest, has joined with Fontana RDA.

---

[1] All statutory references are to the Health and Safety Code unless stated otherwise.

The interested-party defendants are Jeanette Torres, a low-income resident of Fontana, and Libreria del Pueblo, Inc., a nonprofit community organization advocating for increased affordable housing in Fontana.[2]

In particular, defendants challenge the validation action filed by Fontana RDA to validate a 2002 settlement agreement and a 2003 resolution to issue $40 million in tax allocation bonds. (Code Civ. Proc., § 860 et seq.; Gov. Code, § 53511; Health & Saf. Code, § 33501.) Defendants charge Fontana RDA has been paying most, if not all, of its redevelopment tax increment revenues to a developer, Ten-Ninety, rather than meeting its legal obligations under the Community Redevelopment Law (§ 33000 et seq.) to provide adequate affordable housing. Defendants appeal from a judgment in favor of Fontana RDA, granting the validation action.

We decide the court erred in granting the validation action because the settlement agreement does not qualify as a contract under Government Code section 53511 and because the proposed $40 million in tax allocation bonds would exceed Fontana RDA's limitation on bonded debt secured by tax increment revenue for the Jurupa Hills redevelopment project.

Tax increment revenue is the increase in property tax revenue generated by redevelopment: "Since redevelopment agencies receive tax increment revenue only to the extent they incur debt (§§ 33670, subd. (b), 33675), redevelopment agencies commonly finance redevelopment by issuing tax allocation bonds secured by an agency's future stream of tax increment revenue payments. (§§ 33640, 33641; [citations].)" (*Craig v. City of Poway* (1994) 28 Cal.App.4th 319, 325 [33 Cal.Rptr.2d 528].)

## 2. Factual and Procedural Background

The factual recitation is derived from the allegations of the validation action and the administrative record. We also grant the requests for judicial notice filed by Fontana RDA on January 31 and June 6, 2007. (Evid. Code, §§ 452, subd. (h), 455, 459; Cal. Rules of Court, rule 8.252(a).)

The City of Fontana established its redevelopment agency in 1968. (§§ 33003, 33100 et seq.)

---

[2] Another named interested-party defendant was Magdelena Diaz but she is not a party to this appeal. The Claremont Institute Center for Constitutional Jurisprudence has filed an amicus curiae appellate brief supporting defendants' position.

Since 1976, the Community Redevelopment Law has mandated that 20 percent of redevelopment money be designated for a low- and moderate-income housing fund. (§§ 33334.2, 33334.3, 33334.6, and 33334.10; *Craig v. City of Poway, supra,* 28 Cal.App.4th at pp. 325–326, 334–336.)

In 1981, the Fontana City Council adopted a redevelopment plan for the Jurupa Hills project area, which provided a limit of $50 million for bonded indebtedness. (§ 33334.1.) The plan contemplated spending 20 percent of its tax increment revenue on infrastructure like schools, streets, and drainage to benefit affordable housing. The redevelopment plan was amended three times, in 1983, 1987, and 1994. The 1987 amendment included an increase in the limit for bonded indebtedness to $135 million.[3]

To facilitate the Jurupa Hills redevelopment project, Fontana RDA entered into an owner participation agreement (OPA) in 1982 with Ten-Ninety's predecessor. The agreement provided Fontana RDA would remit tax increment revenue to the developer in exchange for the developer providing capital and construction financing to complete the public infrastructure improvements required for development of about 8,800 housing units and related commercial and other-use facilities. Fontana RDA obtained a validation judgment for the OPA.

The OPA was first amended in 1984, raising the interest rate from 10 percent to 15.5 percent. In 1987, the OPA was amended again, with Fontana RDA pledging to pay Ten-Ninety all its tax increment revenues, with no provision for a 20 percent set-aside to benefit affordable housing. The 1987 amendment included the statement that the Ten-Ninety debt "is and shall be treated in all respects and at all times as a bonded or other indebtedness of the Agency." Again, Fontana RDA obtained a validation judgment. A third amendment was executed in 1992 and was validated. The third amendment of the OPA established four categories of debt, including "reserve debt" for any amount over the secured bonded debt limitation of $135 million. All debt "shall be treated in all respects and at all times as a bonded or other indebtedness." The specifics of the third amendment are discussed later in this opinion.

In 1993, section 33334.2 was amended to limit the use of housing fund money to pay for infrastructure improvements that are incorporated into affordable housing projects. In its present version section 33334.2 states: "(e) In carrying out the purposes of this section, the agency may exercise any or all of its powers for the construction, rehabilitation, or preservation of affordable housing for extremely low, very low, low- and moderate-income

---

[3] Defendants contend the limit is actually only $50 million but, in either case, the limit has been violated.

persons or families, including the following: [¶] . . . [¶] (2)(A) Improve real property or building sites with onsite or offsite improvements, but only if both (i) the improvements are part of the new construction or rehabilitation of affordable housing units for low- or moderate-income persons that are directly benefited by the improvements, and are a reasonable and fundamental component of the housing units . . . ."

In May 2001, the State Department of Housing and Community Development (Department) audited Fontana RDA's programs, including its administration of the tax increment revenue required to promote affordable housing. (§ 33464.) In its findings, the draft audit concluded that Fontana RDA needed to reimburse the housing fund and the specific Jurupa Hills housing fund. As defendants interpret the record, the audit concluded Fontana RDA owed at least $14 million to the housing fund and an additional $53 million to the Jurupa Hills housing fund.

The draft audit also generally criticized Fontana RDA's housing rehabilitation efforts, its planning for sufficient affordable housing, its submission of inaccurate information concerning housing, the transfer of unauthorized funds from the county Housing Authority (§ 34240) to the housing fund, and the use of housing fund revenues for neighborhood beautification and general planning and administrative expenses. An additional 1,835 units of affordable housing were deemed to be required.

The Final Audit Report, issued in November 2001, confirmed the Department's earlier findings. Subsequently, in November 2002, the Department and Fontana RDA entered into a Settlement Agreement and General Release directed at resolving the issues about affordable housing raised in the audit report. The settlement agreement provided Fontana RDA would pay $6.1 million to the housing fund but no money to the specific Jurupa Hills housing fund.

For the tax year 2002–2003, Fontana RDA's Statement of Indebtedness declared debt of more than $1.5 billion. Fontana RDA owed Ten-Ninety nearly $1.3 billion, including interest of about $988 million incurred at the rate of 15.5 percent since 1982. The annual tax increment revenue was a mere $9,108,289.

In January 2003, Fontana RDA and the Fontana City Council approved issuing two series of tax allocation bonds, totaling $40 million, to provide for repayment to Ten-Ninety. The limit of the outstanding bonded indebtedness for Jurupa Hills is $135 million. Based on its interpretation of the Statement

of Indebtedness (§ 33675) for the 2001–2002 tax year, Fontana RDA contends its bonded indebtedness is $86,155,000. Fontana RDA estimates its total principal debt to be about $174 million.

Fontana RDA filed the validation complaint in February 2003. The first cause of action seeks judicial validation of the settlement agreement. The second cause of action seeks validation of the $40 million bond issue.

Interested-party defendants Torres and Liberia answered the complaint and opposed validation of both causes of action.

Based on the administrative record, the parties' briefs, and oral argument, in May 2005, the trial court found in favor of Fontana RDA, ruling the settlement agreement was properly subject to validation and the proposed bond issue did not exceed the $135 million plan limit, as well as other related findings supporting the judgment.

### 3.  Standard of Review

According to defendants, the essential issues are whether the Department and Fontana RDA could enter into the settlement agreement; whether the settlement agreement could be the subject of a validation action; whether the $40 million bond issue is valid; and whether Fontana RDA has avoided paying 20 percent of the redevelopment bond proceeds and tax increment revenue into the housing fund. Defendants contend all of these issues are subject to this court's independent review. (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10]; *Graber v. City of Upland* (2002) 99 Cal.App.4th 424, 429 [121 Cal.Rptr.2d 649].) Defendants further contend there is a mixed factual and legal issue, also subject to independent review, about whether the bond issue will directly benefit affordable housing. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

Fontana RDA agrees the proper standard of review is de novo. It emphasizes, however, the appellate court must presume the correctness of the trial court's judgment, regardless of the trial court's reasoning. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [51 Cal.Rptr.2d 444, 913 P.2d 473].)

### 4.  Validation of the Settlement Agreement

Defendants contend the settlement agreement is not subject to a validation action under Code of Civil Procedure section 860, the general validation

statute. Fontana RDA contends the validation action is proper pursuant to Government Code section 53511.

The validation procedure must be separately authorized by another statute other than the general validation statute itself: "A public agency may upon the existence of any matter which under any other law is authorized to be determined pursuant to this chapter, and for 60 days thereafter, bring an action in the superior court of the county in which the principal office of the public agency is located to determine the validity of such matter. The action shall be in the nature of a proceeding in rem." (Code Civ. Proc., § 860.)

Fontana RDA claims statutory authority for a validation action is found in Government Code section 53511, subdivision (a): "A local agency may bring an action to determine the validity of its bonds, warrants, contracts, obligations or evidences of indebtedness pursuant to . . . Section 860 . . . of the Code of Civil Procedure." The parties appear to agree that only the term "contracts" applies in this instance.

█ Fontana RDA argues the settlement agreement qualifies as a contract "involving financing and financial obligations." In *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 843 [73 Cal.Rptr.2d 427], the court held a redevelopment agency's pledge of public funds to ensure repayment of bonds issued to finance construction of an aquarium facility was properly the subject of a statutory validation action. But other contracts, such as vendor contracts, are not commonly considered subject to validation under Government Code section 53511. (*Phillips v. Seely* (1974) 43 Cal.App.3d 104 [117 Cal.Rptr. 863] [contract for legal services for indigent defendants]; *Smith v. Mt. Diablo Unified Sch. Dist.* (1976) 56 Cal.App.3d 412 [128 Cal.Rptr. 572] [computer purchase agreement].)

Instead, the case law consistently interprets "contracts" narrowly: "The meaning of the term [contracts] was exhaustively analyzed in *City of Ontario v. Superior Court* (1970) 2 Cal.3d 335, 342–344 [85 Cal.Rptr. 149, 466 P.2d 693]. The court noted that, while the statute does not expressly qualify the term, the legislative history and statutory context indicated that it does not apply generally to all municipal contracts but rather should be construed in pari materia with the other terms in the statute. Narrowly construed in this sense, the term . . . applies to contracts such as . . . financial obligations in 'joint financing agreements' between local agencies. (*Id.* at

p. 343.)" (*Meaney v. Sacramento Housing & Redevelopment Agency* (1993) 13 Cal.App.4th 566, 577 [16 Cal.Rptr.2d 589]; see *Kaatz v. City of Seaside* (2006) 143 Cal.App.4th 13, 32–42 [49 Cal.Rptr.3d 95].)

A further consideration is whether "[t]he lack of a prompt validating procedure would impair this public agency's ability to operate and carry out its statutory purpose." (*Graydon v. Pasadena Redevelopment Agency* (1980) 104 Cal.App.3d 631, 646 [164 Cal.Rptr. 56].) *Graydon* involved redevelopment financing by bonds to be paid from tax increment revenues. As discussed by the *Graydon* court, impairment encompasses the effects of "the lack of a prompt validating procedure" on the marketability of public bonds, potential third party lenders, higher interest rates, or even denial of credit, all of which might hamper an agency's operations. (*Id.* at p. 644.) Therefore, if an agency is delayed in issuing and paying its bonds, it impairs the agency's ability to operate and carry out its redevelopment plan, having "a direct bearing on the financial ability of Agency to meet its financial obligations and statutory purpose." (*Id.* at p. 646.)

The present contract, the settlement agreement, addresses financial matters in two places. Article 2.9 states: "The Audit Documents [the 2001 Department audit] have in a practical way impaired the ability of the Agency [Fontana RDA] to exercise, undertake and carry out its statutory and contractual authority and obligations with respect to the implementation of certain of the Redevelopment Plans. In particular, without limiting the generality of the foregoing, the Audit Documents have impaired the Agency's ability to incur those financial and other obligations necessary and convenient to the exercise of the Agency's authority and fulfillment of its obligations pursuant to the CRL [Community Redevelopment Law] and the various contractual obligations it has undertaken in accordance therewith. In particular, the Audit Documents have impaired the Agency's ability to issue bonded indebtedness and undertake other financial obligations necessary to implement and carry out the redevelopment of the Project Areas." The settlement agreement also provides Fontana RDA should pay to the housing fund redevelopment revenues of $3,559,750 and the additional sums of $2,583,473 and $516,694.60.

The settlement agreement attempts, by its express terms, to cast the document as a contract aimed at facilitating the financial operations necessary to fulfill the statutory obligations of Fontana RDA. The agreement asserts that, unless the issues raised in the audit were resolved promptly without significant delay, Fontana RDA would be significantly impaired in its redevelopment activities. Other than the bare language of the agreement itself,

however, there is no evidence of impairment in the record. Furthermore, the settlement agreement provides Fontana RDA shall pay the housing fund about $6.1 million. But it does not constitute a " 'joint financing agreement[]' between local agencies . . . [[c]itation . . .]" as in *Meaney v. Sacramento Housing & Redevelopment Agency, supra,* 13 Cal.App.4th at page 577. Nor does the settlement agreement involve the issuance or payment of tax allocation bonds as in *Graydon v. Pasadena Redevelopment Agency, supra,* 104 Cal.App.3d at page 646.

■ Instead, the settlement agreement requires the Fontana RDA to contribute redevelopment revenues to the housing fund, something the audit found Fontana RDA had failed to do. As such, the settlement agreement does not fit Government Code section 53511's narrow definition of "bonds, warrants, contracts, obligations or evidences of indebtedness," which are used to secure financing for redevelopment. Instead, Fontana RDA agreed to satisfy part of its statutory requirement to deposit development money into the housing fund.

Although there may be other means by which to challenge the settlement between Fontana RDA and the Department, a validation action under Code of Civil Procedure section 860 and Government Code section 53511 is not the proper vehicle. Therefore, we cannot decide the validity of the settlement agreement because it was not subject to a validation proceeding. We express no opinion about whether defendants may challenge the settlement agreement in an alternative proceeding.

### 5. Validation of the $40 Million Bond Issue

In contrast to the settlement agreement, the validation proceeding concerning the bond issue is properly brought under Code of Civil Procedure section 860 and Health and Safety Code section 33501. The substance of defendants' claim is that the bond issue exceeds the bonded debt limits of $135 million for the Jurupa Hills project and does not meet Fontana RDA's obligation to provide low-income housing. Defendants contend that ultimately Fontana RDA will owe more than $1.3 billion to Ten-Ninety, mostly in accrued interest, severely exceeding its debt limitations and hampering its ability to provide affordable housing.

■ The redevelopment law requires a redevelopment agency to establish the maximum amount of bonded indebtedness secured by tax increment revenues. (Cal. Const., art. XVI, § 16, subds. (b), (c); §§ 33334.1, 33670, 33671; *Marek v. Napa Community Redevelopment Agency* (1988) 46 Cal.3d 1070, 1080–1082 [251 Cal.Rptr. 778, 761 P.2d 701].) Section 33334.1 provides: "If the [redevelopment] plan authorizes the issuance of bonds to be

repaid in whole or in part from the allocation of taxes pursuant to Section 33670, the plan shall establish a limit on the amount of bonded indebtedness which can be outstanding at one time without an amendment of the plan."

The trial court found that any debt exceeding the bonded debt limitation of $135 million for Jurupa Hills was not payable from tax increment revenues but could be characterized as "reserve debt." Defendants contend "reserve debt" is a subterfuge and the debt limitations cannot be circumvented by distinguishing between secured or bonded debt and reserved debt because, notwithstanding how they are labeled, both kinds of debt are repaid ultimately with tax increment revenues. Defendants also argue the $40 million bond issue impairs or prohibits Fontana RDA's obligation to provide affordable housing since all the bond proceeds are designated to pay Ten-Ninety and not paid into the housing fund.

The 1992 amendment to the OPA defined four categories of debt: bond debt, OPA debt, nonreserve debt, and reserve debt. Nonreserve debt includes "the principal amount of all Agency indebtedness permitted by this Agreement and payable solely from tax increment revenues, including without limitation, the principal amount of the OPA Debt and Bond Debt, which does not exceed at any one time the sum of $135,000,000, plus all accrued interest on said principal amount." Reserve debt means "the principal amount of all Agency indebtedness permitted under this Agreement and payable solely from tax increment revenues, including without limitation, the principal amount of OPA Debt and the principal amount of Bond Debt, which is in excess of, at any one time, the sum of $135,000,000, plus all accrued interest on said principal amount."

The only distinction between nonreserve debt and reserve debt is that nonreserve debt is debt under $135 million and reserve debt is debt over $135 million. But both kinds of debt are expressly "payable solely from tax increment revenues" and will be paid from the proceeds of tax allocation bonds. In fact, as previously stated, both the 1987 and 1992 OPA amendments deem that OPA debt is "bonded indebtedness." For that reason, we do not find any support for the trial court's finding that the "proposed Bond Issue will not exceed the $135 million plan limit on the principal amount of bonded indebtedness payable from tax increments"; "the issuance of the Bonds . . . will not have exceeded the $135,000,000.00 plan amount"; and "[t]he so-called reserve debt is not a debt repayable from tax increments and does not exceed the plan limit." Quite clearly, both kinds of debts are repayable from tax increment and will finally be paid, if at all, with tax allocation bonds. Both kinds of debt qualify as secured indebtedness subject to limitation. (*Marek v. Napa Community Redevelopment Agency, supra,* 46 Cal.3d at pp. 1080–1081.) Calling the same kind of debts by different names should not allow Fontana RDA improperly to circumvent the statutory limitations of the Jurupa Hills redevelopment plan. (*Graber v. City of*

*Upland, supra,* 99 Cal.App.4th at pp. 433–434.) An additional $40 million in bond issues exceeds the redevelopment plan's $135 million limitation on bonded debt whether the total secured debt for the Jurupa Hills project stands at $174 million, $1.3 billion or more.

■ Because the $40 million bond issue adds to the redevelopment secured debt over $135 million, the validation action should have been rejected, even though it arises from the 1992 amendment to the OPA that was previously validated. The courts cannot validate ongoing illegality. (*Stockton Morris etc. Co. v. Calif. etc. Corp.* (1952) 112 Cal.App.2d 684, 689–690 [247 P.2d 90].) Furthermore, even when an illegal act may be immune from facial attack, it can be challenged under new factual circumstances. (*Travis v. County of Santa Cruz* (2004) 33 Cal.4th 757, 768, 771–776 [16 Cal.Rptr.3d 404, 94 P.3d 538].) In the present case, the 1992 OPA amendment was validated but the 2003 proposal to issue new tax allocation bonds should not have been validated because it violated the redevelopment plan's debt limitations: " 'The 60-day limitations period in section 33500 does not apply to the type of challenge appellant is making here because he is not attacking the legality of the redevelopment plan as *originally adopted,* but is questioning the implementation of the plan . . . . *Appellant had no reason to object when the plan was adopted.* It was *not apparent at that time that the agency might be deviating from its resolved purpose* and planning an illegal use for the property . . . until eight years after the plan's adoption. Section 33500 cannot be used to immunize an agency which adopts a redevelopment plan legal on its face, then after the 60-day period has elapsed *deviates from its resolved purpose* . . . . Section 33500 applies only to attacks on the redevelopment plan as adopted, and not to actions alleging illegal implementation of the plan.' " (*Boelts v. City of Lake Forest* (2005) 127 Cal.App.4th 116, 132 [25 Cal.Rptr.3d 164] (*Boelts*), citing *Redevelopment Agency v. Herrold* (1978) 86 Cal.App.3d 1024, 1029 [150 Cal.Rptr. 621].)

Here defendants are not challenging the 1981 Jurupa Hills redevelopment plan or the related 1982 OPA or any of the subsequent amendments to the plan or the OPA that were validated over the years. Instead, defendants are relying upon the 1987 debt limitation that is expressly part of the redevelopment plan. Defendants are properly attacking, not the previously validated OPA amendment, but the implementation of the redevelopment plan by allowing issuance of tax allocation bonds in 2003 that exceed the plan's limitation on indebtedness secured by tax increment revenue. This is not an issue that could have been anticipated or decided in 1987 when the redevelopment plan was amended to raise the debt ceiling to $135 million. (See *Starr v. City and County of San Francisco* (1977) 72 Cal.App.3d 164, 178–179 [140 Cal.Rptr. 73] (*Starr*).)

Finally, an alternative and persuasive reason for not validating the bond issuance is Fontana RDA's failure to meet the statutory goal of providing affordable housing and the absence of a provision in the bond proposal for making the legally required contribution of 20 percent to the housing fund. (§§ 33334.2, 33334.3, and 33334.10; *Craig v. City of Poway, supra,* 28 Cal.App.4th at pp. 325–326, 334; *Lancaster, supra,* 20 Cal.App.4th at p. 1662.)

As previously set forth, the specific obligation to provide a 20 percent set-aside of tax increment redevelopment revenues for affordable housing began in 1976. In 1981, Fontana RDA adopted the redevelopment plan allocating 20 percent of its tax increment revenues to infrastructure improvements. At that time, the redevelopment plan was subject to a limit of $50 million on bonded indebtedness. In 1987, the redevelopment plan was amended to increase the limit on bonded indebtedness to $135 million. Also in 1987, the OPA was amended, pledging all tax increment revenue to Ten-Ninety and with no provision being made for the 20 percent set-aside. After 1987, Fontana RDA was not using any tax increment revenue for affordable housing. In 1993, the law was changed to limit the use of tax increment designated for affordable housing to pay for infrastructure improvements unless they are part of new construction or rehabilitation of affordable housing. (§ 33334.2, subd. (e).) The state audit found $53 million was owing to the Jurupa Hills housing fund, belying Fontana RDA's claim that it was complying with the statutory requirements. Finally, Fontana RDA has continued its course of noncompliance by proposing to issue tax allocation bonds, the proceeds from which are payable solely to Ten-Ninety and none for affordable housing.

What the record inescapably demonstrates is Fontana RDA's lack of compliance with the required 20 percent contribution for affordable housing since 1987. Instead, all tax increment revenues appear to be diverted to Ten-Ninety to pay off almost a billion dollars in interest. Any previous findings made in 1981 that payments toward the infrastructure benefited affordable housing were made under the law and circumstances existing at the time, not in 2003 when the new tax allocation bonds were proposed. (*Boelts, supra,* 127 Cal.App.4th at p. 132; *Lancaster, supra,* 20 Cal.App.4th at p. 1662; *Starr, supra,* 72 Cal.App.3d at pp. 178–179.) The present and future benefits to affordable housing appear to be nonexistent. Although defendants may not be able to challenge earlier actions by Fontana RDA, they should be able to curtail this most recent effort to evade the statutory obligation to provide and promote affordable housing.

## 6. Disposition

In conclusion, we reverse the judgment granting the validation action and order the interested-party defendants, as prevailing parties, to recover their costs on appeal.

Ramirez, P. J., and Hollenhorst, J., concurred.

Petitions for a rehearing were denied August 24, 2007, and the opinion was modified to read as printed above. The petitions of all respondents for review by the Supreme Court were denied October 24, 2007, S155994.