Filed 3/23/16 Unmodified opinion attached

| | |
|---|---|
| VIRGINIA MACY et al., | D068508 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. CIVDS1107686) |
| THE CITY OF FONTANA, | |
| Defendant and Respondent; | ORDER MODIFYING OPINION |
| TEN-NINETY, LTD., | [NO CHANGE IN JUDGMENT] |
| Real Party in Interest and Respondent. | |

THE COURT

It is ordered that the opinion filed herein on February 23, 2016 be modified as follows:

On page 14, the first paragraph of section III, beginning with "Finally, we must reject plaintiffs' contention," is replaced with the following paragraph:

> Finally, we must reject plaintiffs' contention the city's role as a party to the OPA and, under its terms, a recipient of tax increment funds, makes the city responsible for the agency's past failures to meet its low- and moderate-income housing obligations. As plaintiffs point out, under the 1992 amendment to the OPA, which made the city a party to the OPA, the city warranted and covenanted that the agency had met its low- and moderate-income housing obligations under the CRL, and the parties agreed that an amount equal to 35

percent of the agency's tax increment revenues pledged and payable to Ten-Ninety would be paid into a fiscal agent account owned and controlled by Ten-Ninety and thence to the city as compensation for negative fiscal impacts which development by Ten-Ninety had on the city. As we have indicated, these provisions were the subject of a successful validation proceeding under Code of Civil Procedure section 860.

THERE IS NO CHANGE IN JUDGMENT

_____

BENKE, Acting P. J.

Copies to: All parties

Filed 2/23/16 Unmodified opinion

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| VIRGINIA MACY et al., | D068508 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. CIVDS1107686) |
| THE CITY OF FONTANA, | |
| Defendant and Respondent; | |
| TEN-NINETY, LTD., | |
| Real Party in Interest and Respondent. | |


APPEAL from a judgment of the Superior Court of San Bernardino County, David S. Cohn, Judge. Affirmed.


Western Center on Law and Poverty, S. Lynn Martinez, Richard A. Rothschild, Stephanie E. Haffner, Sue L. Himmelrich, Maria Eugenie Palomares; The Public Interest Law Project, Deborah Collins and Michael Rawson for Plaintiffs and Appellants.

Best Best & Krieger, Victor L. Wolf, Danielle G. Sakai and Kevin J. Abbott for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

In 2011, the Legislature adopted legislation, which as of June 29, 2011, dissolved the redevelopment agencies (RA's) that had been formed by municipalities throughout the state under the provisions of the Community Redevelopment Law (Health & Saf. Code,[1] § 33000 et seq.; hereafter CRL).  (See § 34170; see also Assem. Bill No. 26 (2011-2012 1st Ex. Session); hereafter AB 26.)  Before their dissolution, the operations of RA's were funded by way of so-called "tax increment" financing.

AB 26 provided a fairly detailed scheme for winding down the operations of RA's, distributing their assets, and resolving claims against them.  In particular, AB 26 created successor agencies that were given responsibility over certain obligations of each dissolved RA.  Importantly, under the dissolution legislation, the liability of successor agencies was limited to the value of the assets those agencies received from their respective predecessor RA's.

Shortly before the Legislature dissolved RA's, plaintiffs and appellants Virginia Macy, a low-income resident of the city; Libreria Del Pueblo, Inc.; and California Partnership (collectively plaintiffs) filed a petition for a writ of mandate against the Fontana Redevelopment Agency (the agency), alleging the agency failed to provide the low- and moderate-income housing required under the CRL.  Plaintiffs asked for relief in the form of the payment of $27 million into the agency's low- and moderate-income housing fund (LMIHF).

---

[1]     All further statutory references are to the Health and Safety Code unless otherwise indicated.

2

After enactment of AB 26, plaintiffs amended their petition and added defendant and respondent City of Fontana (the city), initially in its role as the successor agency provided by AB 26, and later also in its separate capacity as a municipal corporation. In its capacity as a municipal corporation, the city filed a demurrer to the petition, arguing that under AB 26 only a successor agency may be held liable for the preexisting obligations of an RA. The trial court sustained the demurrer without leave to amend.

We affirm. Under the scheme adopted by the Legislature under AB 26, the liabilities of dissolved RA's are limited to the assets transferred to successor agencies. There is nothing in AB 26, or later amendments to the dissolution legislation, that would extend that liability beyond an RA's assets to municipalities and their general funds. As we explain, the low- and moderate-income housing liabilities plaintiffs seek to enforce arose under the CRL and were calculated as a percentage of tax increment funds collected by RA's; prior to dissolution of RA's, those liabilities were never the liabilities of municipalities and their general funds. An extension of RA statutory liabilities to municipalities and their general funds would require a very clear expression of the Legislature's intention to depart from the historical treatment of low- and moderate-income housing obligations; no such expression appears in AB 26 or later amendments to the dissolution legislation.

Contrary to plaintiffs' argument on appeal, neither the city's control over the agency, nor a 1992 agreement the city made with the agency and a developer with respect to distribution of its tax increment revenue, will support a claim against the city in its

3

municipal capacity. Although the city controlled the agency, the city's control did not make the city and its general fund liable for the agency's obligations with respect to disposition of tax increment revenue. Admittedly, under the terms of the 1992 agreement, the city received a percentage of the agency's tax increment revenue, and in light of the agency's obligations to its LMIHF, arguably those payments to the city were improper. However, the agreement was subject to a successful validation proceeding brought by the agency, which, as we explain, foreclosed any claims against the city with respect to tax increment funds it received under the agreement.

FACTUAL AND PROCEDURAL BACKGROUND

A. *1992 OPA*

Since 1976, the CRL has required that RA's use 20 percent of their revenue in support of low- and moderate-income housing. (*Fontana Redevelopment Agency v. Torres* (2007) 153 Cal.App.4th 902, 906 (*Fontana I*); see § 33334.2 et seq.) As fully set forth in the court's opinion in *Fontana I*, for a number of years the agency failed to meet the low- and moderate-income housing obligations imposed on it under the CRL. (*Id*. at pp. 914-915.)

In substantial measure, this failure grew out of the agency's agreement to pay its tax increment revenue to a developer, who was the predecessor in interest of real party in interest, Ten-Ninety, Ltd. (Ten-Ninety). The agency agreed to pay its tax increment revenues to Ten-Ninety in exchange for capital and construction financing Ten-Ninety provided for the completion of infrastructure improvements needed for development of

4

8,800 housing units and related commercial and other use facilities. (*Fontana I*, *supra*, 153 Cal.App.4th at p. 906.) The agreement with Ten-Ninety was called an Owner Participation Agreement (OPA) and, in addition to the agency and Ten-Ninety, by way of amendment, the city became a party to the OPA in 1992.

Under the amended OPA, the agency agreed that its tax increment revenues would be paid to a fiscal agent and that the fiscal agent would pay 65 percent of the revenues to Ten-Ninety and 35 percent of the revenues to the agency and the city. The amended OPA stated that the infrastructure Ten-Ninety financed would support the development of low- and moderate-income housing and that the agency's payments to Ten-Ninety thereby met the agency's low- and moderate-income housing obligations under the CRL. The amended OPA further stated that the payments the city received under the amended OPA were compensation to the city for fiscal costs the city incurred as a result of Ten-Ninety's development within the city. Importantly, the agency and the city brought a validation action under Code of Civil Procedure section 860 with respect to the amended OPA, and a final judgment finding that the amended agreement was valid was entered.

B. *Fontana I*

In 1992, the Legislature amended section 33334.2 and expressly required that funds for low- and moderate-income housing be used for improvements if "the improvements are made as part of a program which results in the new construction or rehabilitation of affordable housing units for low[-] or moderate-income persons *that are directly benefited by the improvement or . . . the agency finds that the improvements are*

5

*necessary to eliminate a specific conditions that jeopardizes the health or safety of existing low*[-] *or moderate-income residents*." (Italics added.)[2]

In 2001, the State Department of Housing and Community Development (the department) performed an audit of the agency's programs, including in particular its compliance with the CRL's low- and moderate-income housing obligations. The department's audit found that the agency needed to reimburse two of its LMIHF's a total of $67 million. (See *Fontana I*, 153 Cal.App.4th at p. 907.) Following the department's audit, the agency and the department entered into a settlement agreement under which the agency agreed to pay $6.1 million into one of its LMIHF's. (*Ibid.*)

At the time of the settlement agreement, the agency also approved the issuance of tax allocation bonds totaling $40 million. The agency planned to issue the proceeds of the bonds as a means of meeting its obligations to Ten-Ninety.

The agency brought a validation proceeding in which it sought validation of both its settlement agreement with the department and issuance of the bonds. In *Fontana I*, a low-income resident of the city and a nonprofit community organization, Libreria Del Pueblo, Inc. (Libreria), challenged the validation, and, on appeal, they were successful. The court found that the settlement agreement with the department was not subject to validation under Code of Civil Procedure section 860 and that the bond issue was invalid because, if the bonds were issued, the agency would exceed debt limitations it had adopted. (*Fontana I*, *supra*, 153 Cal.App.4th at pp. 910-913.) In the alternative, the

---

2     The amendment became effective on January 1, 1993. (See Stats. 1992, ch. 1356, § 8.)

6

court found the bonds were unlawful because they would perpetuate the agency's failure to meet its low- and moderate-income housing obligations.  (*Id*. at pp. 913-914.)  The court noted the defendants were not challenging the validity of prior implementation plans the agency had adopted, the OPA, or any amendment of the OPA.  (*Id*. at p. 913.)  However, the court found that the defendants in *Fontana I* could challenge the validity of the agency's new effort, by way of the settlement agreement with the department and the issuance of new bonds, to perpetuate its past unlawful practices.  (*Id*. at pp. 913-914.)  The court stated:  "What the record inescapably demonstrates is [the agency's] lack of compliance with the required 20 percent contribution for affordable housing since 1987. . . .  Although defendants may not be able to challenge earlier actions by [the agency], they should be able to curtail this most recent effort to evade the statutory obligation to provide and promote affordable housing."  (*Id*. at p. 914.)

C. *These Proceedings*

On June 21, 2011, plaintiffs filed a petition for a writ of mandate in which they alleged that the agency was continuing its practice of failing to use 20 percent of its tax increment revenues in support of low- and moderate-income housing, as required by section 33334.2 et seq.  Plaintiffs alleged that between 2001 and 2010, the agency had failed to pay into its LMIHF a total of $26 million otherwise required by section 33334.2

AB 26 became effective as of June 29, 2011.  Under its terms, no new RA's could be created, and, as we indicated, it provided a detailed scheme for winding down the activities of existing RA's.  In short, it provided that, other than an RA's' housing assets,

7

all assets and liabilities of individual RA's would be assumed by individual "successor agencies" and that the RA's housing assets would be assumed by individual "housing successors." AB 26 gave any municipality that created an RA the option of becoming either the RA' s "successor agency," "housing successor," or both; AB 26 also permitted local housing authority to become "housing successors." Significantly, AB 26, discontinued as of June 29, 2011, the obligation of RA's and their successors to pay 20 percent of their tax increment revenue in support of low- and moderate-income housing. (§§ 34163, subd. (c)(4), 34176, subd. (d), 34176.1.)

Following adoption of AB 26, the city elected to become the agency's successor agency; because the city was not willing to do so, the Fontana Housing Authority (housing authority) became the agency's housing successor. In light of the city's election, plaintiffs amended their petition to add the city as a defendant in its capacity as the agency's successor agency and the housing authority as housing successor. As we indicated at the outset, later plaintiffs amended their petition to add the city in its capacity as a municipal corporation. Plaintiffs alleged that under the amended OPA the city had assumed responsibility for the agency's compliance with the CRL and further that it had unlawfully received and continued to unlawfully receive tax increment revenues.

The city, in its capacity as a municipal corporation, demurred to the complaint, and its demurrer was sustained without leave to amend. A judgment of dismissal was entered in the city's favor, and plaintiffs filed a timely notice of appeal.[3]

---

[3] The city and the housing authority in their successor capacities also filed demurrers to the plaintiffs' petition on the grounds it was barred by provisions of AB 26.

8

I

Contrary to plaintiffs' suggestion on appeal, nothing in the CRL itself makes a municipality, such the city, responsible for the obligations of an RA. (See *Pacific States Enterprises*, *Inc. v. City of Coachella* (1993) 13 Cal.App.4th 1414, 1424-1425 (*Pacific States Enterprises*).) In *Pacific States Enterprises*, a developer sued a city alleging breach of contract by the city's RA. In affirming an order sustaining the city's demurrer without leave to amend, we stated: "Redevelopment agencies are governmental entities which exist by virtue of state law and are separate and distinct from the communities in which they exist. Health and Safety Code section 33100 states: 'There is in each community a public body, corporate and politic, known as the redevelopment agency of the community.' Health and Safety Code section 33125 states: 'An agency may: (a) Sue and be sued. . . . (c) Make and execute contracts and other instruments necessary or convenient to the exercise of its powers.' [¶] . . . [¶]

"Well-established and well-recognized case law holds that the mere fact that the same body of officers acts as the legislative body of two different governmental entities does *not* mean that the two different governmental entities are, in actuality, one and the same. [Citations.] This principle was perhaps stated most succinctly in the *County of L.A. v. Continental Corp.* [(1952) 113 Cal.App.2d 207] opinion: 'Thus, the Board of

---

The trial court overruled their demurrers, and we denied the agency and the city's petition for a writ of mandate, although we noted that there are substantial obstacles to the relief the plaintiffs seek.

Supervisors of the Los Angeles County Flood Control District [which is comprised of the same legislative body of persons as the Board of Supervisors of the County of Los Angeles], when acting as such, are not county officers, but state officers, and any action taken by such board is not action by the Board of Supervisors of the County of Los Angeles, as such, or of the county of Los Angeles.'  (113 Cal.App.2d at p. 220; bracketed material added.)

"Thus, . . . the legislative body which exercises local governmental power within a given jurisdictional territory (a community) may, if it so chooses, also exercise the powers of the redevelopment agency in that territory.  *But*: When a 'dual capacity legislative body' acts as the governing board of a redevelopment agency, it is the redevelopment agency which is acting by and through that legislative body; and when that same legislative body acts as the governing body of the 'community' (i.e., city) over which it exercises local governmental powers, it is the 'community' which is acting by and through that legislative body.  The redevelopment agency and the 'community' are *not* one and the same governmental entity.  The redevelopment agency, by state law, exists 'in each community' with certain limited powers and functions (Health & Saf. Code, §§ 33020, 33100, 33120)--it is not the same entity as the community *within which* it exists.  The mischief which would be done if it were otherwise is apparent.  As argued by the City in its respondent's brief:  'Permitting a damages suit against the City for an alleged breach of contract by the Redevelopment Agency is as improper as allowing a redevelopment agency to take [city] funds earmarked for welfare assistance and spend it

10

on a new commercial development.'  Although the City's hypothetical example may be a bit extreme, we agree in principle with the concern which it highlights." (*Pacific States Enterprises*, *supra*, 13 Cal.App.4th at pp. 1424-1425, fn. omitted.)

The holding of *Pacific States Enterprises* with respect to an RA's contractual liability applies to its statutory responsibilities as well.  An RA and a municipality may, as here, have the same governing body; however, given their separate identities and liabilities, the statutory duties imposed on the RA may not be ascribed to the municipality.[4]

In this regard, we note that the low- and moderate-income housing obligation of RA's was defined as a percentage of tax increment revenues received by RA's. (§ 33334.2.)  Plainly, given this definition, this obligation was never considered one imposed on a city's general fund.

## II[5]

We also reject plaintiffs' suggestion that the city may be held liable under AB 26 and related legislation for the agency's low- and moderate-income housing obligations.

---

[4]     Although plaintiffs rely on the holding in *Nolan v. Redevelopment Agency* (1981) 117 Cal.App.3d 494, 498, in *Pacific States Enterprises* we expressly rejected *Nolan*. (*Pacific States Enterprises*, *supra*, 13 Cal.App.4th at pp. 1424-1425.)  We see no reason to depart from our holding in *Pacific States Enterprises* or its rejection of *Nolan*.

[5]     We grant in their entirety plaintiffs' and the city's requests for judicial notice of city ordinances, agency agreements, earlier validation proceedings and AB 26 as approved by the Legislature and signed by the Governor.  (Evid. Code, §§ 451, subd. (a), 452, subds. (c) & (d), 459.)

11

AB 26 was enacted in 2011 in the midst of a state and local fiscal crisis

engendered by the economic recession that had commenced in 2008.  (AB 26, § 1.)[6]  By

---

[6]     AB 26, section 1 states:  "SECTION 1.  The Legislature finds and declares all of the following:

"(a) The economy and the residents of this state are slowly recovering from the worst recession since the Great Depression.

"(b) State and local governments are still facing incredibly significant declines in revenues and increased need for core governmental services.

"(c) Local governments across this state continue to confront difficult choices and have had to reduce fire and police protection among other services.

"(d) Schools have faced reductions in funding that have caused school districts to increase class size and layoff teachers, as well as make other hurtful cuts.

"(e) Redevelopment agencies have expanded over the years in this state. The expansion of redevelopment agencies has increasingly shifted property taxes away from services provided to schools, counties, special districts, and cities.

"(f) Redevelopment agencies take in approximately 12 percent of all of the property taxes collected across this state.

"(g) It is estimated that under current law, redevelopment agencies will divert $5 billion in property tax revenue from other taxing agencies in the 2011-12 fiscal year.

"(h) The Legislature has all legislative power not explicitly restricted to it. The California Constitution does not require that redevelopment agencies must exist and, unlike other entities such as counties, does not limit the Legislature's control over that existence.  Redevelopment agencies were created by statute and can therefore be dissolved by statute.

"(i) Upon their dissolution, any property taxes that would have been allocated to redevelopment agencies will no longer be deemed tax increment. Instead, those taxes will be deemed property tax revenues and will be allocated first to successor agencies to make payments on the indebtedness incurred by the dissolved redevelopment agencies, with remaining balances allocated in accordance with applicable constitutional and statutory provisions.

"(j) It is the intent of the Legislature to do all of the following in this act:

"(1) Bar existing redevelopment agencies from incurring new obligations, prior to their dissolution.

"(2) Allocate property tax revenues to successor agencies for making payments on indebtedness incurred by the redevelopment agency prior to its dissolution and allocate remaining balances in accordance with applicable constitutional and statutory provisions.

"(3) Beginning October 1, 2011, allocate these funds according to the existing

12

its terms, AB 26 was enacted as means of alleviating that crisis by dissolving RA's and transferring to municipalities, school districts and community college districts, the property tax increment revenue RA's would otherwise collect and devote to redevelopment activities. (AB 26, § 1.) In particular, in enacting AB 26, the Legislature expressly set forth its intent to "[a]llocate property tax revenues to successor agencies for making payments on indebtedness incurred by the redevelopment agency prior to its dissolution and allocate remaining balances in accordance with applicable constitutional and statutory provisions." (AB 26, § 1, subd. (j)(2).) As we have indicated, among other matters, AB 26 discontinued the requirement that agencies and their successors provide support for low- and moderate-income housing. (§§ 34163, subd. (c)(4), 34176, subd. (d), 34176.1.) Nothing on the face of AB 26 itself imposes on municipalities any liability with respect to a dissolved RA's pre-existing low- and moderate-income housing obligations; under AB 26, only successor agencies have such responsibility and then only to the extent they have received funds from a dissolved RA. (See AB 26, § 1, subd. (j)(2).)

In 2012, in follow-up legislation, the Legislature adopted and the Governor signed AB 1484. As the city points out, AB 1484 was enacted as a means of assuring that assets

property tax allocation within each county to make the funds available for cities, counties, special districts, and school and community college districts.
"(4) Require successor agencies to expeditiously wind down the affairs of the dissolved redevelopment agencies and to provide the successor agencies with limited authority that extends only to the extent needed to implement a winddown of redevelopment agency affairs."

13

and income successor agencies received from dissolved RA's were in fact distributed to all the local agencies,—e.g., school districts and community college districts—the Legislature intended as recipients of the funds. In this regard, AB 1484 subjected successor agencies and municipalities acting as successor agencies to an audit procedure and, *for purposes of conducting such audits*, defined cities and counties as including agencies it controlled. (§ 34167.10.) The audit procedures to which the expanded definition of cities set forth in section 34167.10 applies do not expressly or by implication expand the liability of municipalities; rather, as the city contends, the expanded definition is simply a procedural device that gives the required audits necessary breadth.

In sum, AB 26 and AB 1484 do not lend themselves to an interpretation under which municipalities, although among the local agencies intended to benefit from dissolution of RA's, would have their liabilities expanded beyond the assets transferred to them when acting as successor agencies. Given that the expressed intention of AB 26 was to assist local municipalities in meeting their fiscal needs in a time of economic crisis, it would be incongruous to interpret either AB 26 or AB 1484 in a manner that expanded their liability to include responsibility for low- and moderate-income housing obligations that had never previously been imposed on them.

### III

Finally, we must reject plaintiffs' contention the city's role as a party to the OPA and, under its terms, a recipient of tax increment funds, makes the city responsible for the

14

agency's past failures to meet its low- and moderate-income housing obligations.

As plaintiffs point out, under the 1992 amendment to the OPA, which made the city a party to the OPA, the city warranted and covenanted that the agency had met its low- and moderate-income housing obligations under the CRL, and the parties agreed that 35 percent of the agency's tax increment revenues would be paid into an account controlled by the city as compensation for fiscal impacts development by Ten-Ninety had on the city. As we have indicated, these provisions were the subject of a successful validation proceeding under Code of Civil Procedure section 860.

As the city points out, the validation judgment forecloses any claims that attack the validity of the OPA or its terms. Code of Civil Procedure section 870 provides in pertinent part that a validation judgment "if no appeal is taken, or if taken and the judgment is affirmed, shall, notwithstanding any other provision of law including, without limitation, Sections 473 and 473.5, thereupon become and thereafter be forever binding and conclusive, *as to all matters therein adjudicated or which at that time could have been adjudicated*, *against the agency and against all other persons*, *and the judgment shall permanently enjoin the institution by any person of any action or proceeding raising any issue as to which the judgment is binding and conclusive."* (Italics added.) "A validation action implements important policy considerations. '[A] central theme in the validating procedures is speedy determination of the validity of the public agency's action.' [Citation.] 'The text of section 870 and cases which have interpreted the validation statutes have placed great importance on the need for a single

15

dispositive final judgment.' [Citation.] The validating statutes should be construed so as to uphold their purpose, i.e., 'the acting agency's need to settle promptly all questions about the validity of its action.' [Citation.]" (*Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 842)

Here, the central premise of the city's participation in the OPA is the agreement's affirmation that the agency was meeting its obligations under the CRL and that it was lawful to distribute the agency's tax increment funds to Ten-Ninety and the city. The central premise of plaintiffs' claims is, of course, their assertion that the agency was not meeting its obligations under the CRL and that its distributions to Ten-Ninety and the city were not lawful. By obtaining the validation judgment, the city protected itself, as well as the agency and Ten-Ninety, from precisely the claims that plaintiffs' now assert arise under and by virtue of the agreement.

We recognize the amended version of the OPA expressly requires that the city and the agency do nothing that adversely impacts Ten-Ninety's right to receive the pledged tax increment revenue, unless ordered to do so by way of a final order in any action challenging the validity of the OPA. This covenant and condition is part of a provision which further requires that the agency cooperate with Ten-Ninety in "asserting all legal and equitable defenses available to any such action." In simply recognizing the possibility the OPA might be challenged and subject to conflicting orders of a court, but promising not to undermine the OPA and agreeing to cooperate in defending the validity of the pledge, the agency and the city in no sense waived one of the principle defenses to

16

validity of the OPA, the bar provided by Code of Civil Procedure section 870.

Moreover, plaintiffs' reliance on the holdings in *Fontana I*, *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262 and *Starr v. City and County of San Francisco* (1977) 72 Cal.App.3d 164, 178-179 (*Starr*) is unpersuasive. In *Fontana I*, the court expressly noted the plaintiffs were not attacking the validity of the OPA or any prior action of the agency, but only challenging its then most recent attempt to perpetuate its improper distribution of tax increment funds. (*Fontana I*, *supra*, 153 Cal.App.4th at p. 913.) In *County of Solano v. Vallejo Redevelopment Agency*, the court found that a city that improperly benefited from the distribution of its RA's tax increment was subject to a claim for unjust enrichment. (*County of Solano v. Vallejo Redevelopment Agency*, *supra*, 75 Cal.App.4th at pp. 1277-1280.) Significantly, however, the city did not assert that mechanism by which it was benefitted, the use of redevelopment funds for school and road improvements, was subject to a validation judgment. Thus, the court in *County of Solano v. Vallejo Redevelopment Agency* was not, as we are, compelled to give effect to such a validation judgment.

In *Starr*, a municipality and its local RA entered into a financing agreement under which the municipality agreed to lease a sports and exhibition center to be financed by way of bonds issued by the RA. The financing agreement expressly contemplated execution of a more specific project lease and supplemental leases. The financing agreement was the subject of a successful validation action, and a judgment validating it was entered by default. Later, the city and the RA entered into a project lease and

17

separate repayment contract which obligated the city to make payments that exceeded the debt limitations of article XVI, section 18 of the California Constitution.  In finding that the *financing agreement* validation judgment did not prevent a constitutional challenge to the later *repayment contract*, the court stated:  "The financing agreement and settlement agreement which were validated by the court in the 1974 All Persons action contain no hint of the provisions which are violative of the constitutional debt limitation, and which were added in 1975.  Under well settled law, the doctrine of res judicata does not apply where there are changed conditions and new facts which were not in existence at the time of the prior judgment, and upon which such judgment was based.  [Citations.]"  (*Starr*, *supra*, 72 Cal.App.3d at pp. 178-179.)

In important respects *Starr* is analogous to *Fontana I*:  In both cases, what was in dispute was not any past action the municipality *had* already taken, but the validity of a *new*, different action the municipality proposed to take.  In both cases, the respective courts found the new action was different from the past action and not protected by the earlier validation judgment.  Here, of course, neither the city nor the agency have proposed any new action related to the agency's past payment of tax increment revenues to either the city or Ten-Ninety.  Rather, in the end, with respect to the city, plaintiffs at most propose recovering from the city payments paid to the city and Ten-Ninety under the terms of the validated 1992 amendment to the OPA.  Under Code of Civil Procedure section 870, the propriety of that past activity is not subject to relitigation.

Moreover, the 1992 amendment to the CRL, which more strictly limited the ways

18

in which an RA could meet its low- and moderate-income housing obligations, is not a changed circumstance that would permit a challenge to the validated amendment to the OPA. (See *Slater v. Blackwood* (1975) 15 Cal.3d 791, 796-797 [no relief from bar of res judicata "founded on a change in law following the original judgment"]; *Smith v. Brovan* (1979) 97 Cal.App.3d 19, 24.) Admittedly, where an agency has a continuing duty and that duty is altered by way of an act of the Legislature, *injunctive* relief previously granted with respect to that ongoing duty may be adversely affected. (See *Welfare Rights v. Frank* (1994) 25 Cal.App.4th 415, 422-424.) Thus, in *Frank*, a consent judgment by which a county agreed to calculate welfare assistance payments consistent with the then controlling statutory authority, was, with respect to future payments, subject to change when the underlying statutory requirement was altered. (*Ibid.*) Here, of course, the low- and moderate-income housing obligation of RA's has been discontinued in its entirety, and there is no longer any obligation going forward. Thus, what is at issue is the city and Ten-Ninety's prior receipt of tax increment funds under the terms of the validated amendment to the OPA. Having relied on the validation judgment in taking those funds, the city cannot now be asked to return those funds without directly undermining the validation judgment.[7]

---

[7]     In applying the bar provided by res judicata and Code of Civil Procedure section 870, we in no sense embrace the city's administration of the agency and the agency's obvious and longstanding failure to meet its obligations under the CRL. (See *Fontana I*, *supra*, 153 Cal.App.4th at pp. 913-914.) However, as the court in *Slater v. Blackwood* stated: "The consistent application of the traditional principle that final judgments, even erroneous ones [citations], are a bar to further proceedings based on the same cause of action is necessary to the well-ordered functioning of the judicial process. It should not

DISPOSITION

The judgment is affirmed.  The city to recover its costs of appeal.


BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


PRAGER, J.*

---

be impaired for the benefit of particular plaintiffs, regardless of the sympathy their plight might arouse in an individual case."  (*Slater v. Blackwood*, *supra*, 15 Cal.3d at p. 797.)

\*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.