Filed 8/23/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CAM-CARSON, LLC,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>CARSON RECLAMATION AUTHORITY et al.,<br><br>    Defendants and Respondents. | B312729<br><br>Los Angeles County<br>Super. Ct. No. 20STCV16461 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Maureen Duffy-Lewis, Judge. Reversed and remanded.

Latham & Watkins, Richard P. Bress, Daniel S. Schecter, Robert J. Ellison and Nima H. Mohebbi for Plaintiff and Appellant.

Aleshire & Wynder, Sunny K. Soltani and June S. Ailin for Defendants and Respondents City of Carson and the Successor Agency to the Carson Redevelopment Agency.

_____

# SUMMARY

Plaintiff CAM-Carson, LLC sued the City of Carson (City), the Carson Reclamation Authority (CRA) and others for breach of contract and breach of the covenant of good faith and fair dealing. Plaintiff is a commercial real estate developer. Plaintiff entered contracts with the City and CRA to develop a 40-acre site after the City and CRA remediated soil and groundwater contamination, installed infrastructure, and built roads. Plaintiff alleged the City and CRA engaged in gross mismanagement and malfeasance that created a massive funding deficit which derailed the project, causing damages to plaintiff of over $80 million.

Plaintiff seeks to hold the City liable in equity under alter ego principles for the CRA's breach of a contract between plaintiff and the CRA. We hold the alter ego doctrine may be applied to government entities where the facts justify an equitable finding of liability. Here, the allegations in plaintiff's second amended complaint are sufficient to survive the City's demurrer. We cannot say, as a matter of law, the City cannot be held the alter ego of the CRA if plaintiff is able to prove the facts alleged. Accordingly, the trial court erred in sustaining the City's demurrer to plaintiff's breach of contract claim.

For the same reason, the trial court erred in sustaining the City's demurrer to plaintiff's breach of implied covenant claim. Apart from alter ego liability, the court failed to consider plaintiff's allegations that the City breached the implied covenant in connection with a development agreement to which the City was a party.

Accordingly, the judgment of dismissal is reversed.

2

## FACTS

We recite the facts as alleged in the operative complaint.

### 1.    The Parties and the Background

This case involves an undeveloped site the parties call the "157 Acre Site" in Carson. It was operated as a landfill in the 1950's until its closure in 1965. It has sat vacant since then. The site has soil and groundwater contamination that requires environmental remediation before it can be developed. It is subject to a State remedial action plan.

The plaintiff is a joint venture of subsidiaries of two major U.S. commercial real estate developers. The defendants are the City; the CRA, which is a joint powers authority that was "created by the City solely to oversee environmental remediation on the 157 Acre Site"; the Successor Agency to the now-dissolved Carson Redevelopment Authority; and RE | Solutions, LLC (RES), the CRA's primary contractor. (The first three are sometimes referred to collectively as the city defendants. The CRA and RES are not parties to this appeal.)

Over the years, ownership of the 157 Acre Site changed hands between a number of private entities and developers, but none was able to complete the extensive remediation required. In 2006, the site was sold to Carson Marketplace LLC, which entered into an agreement with the Carson Redevelopment Agency to effectuate a redevelopment plan under the State remedial action plan. But that project could not be completed either.

In 2012, the Carson Redevelopment Agency was dissolved in accordance with state law. The Carson city council passed a resolution creating the Successor Agency to serve as successor to the redevelopment agency, and " 'the City became the Successor

Agency of the former redevelopment agency by operation of law.' " [1] The Successor Agency assumed the redevelopment agency's enforceable obligations, including the obligation to fund the remediation work, "an obligation which the City and Successor Agency admit still exists today." (Boldface & italics omitted.)

By 2015, the City determined that a governmental entity would have to acquire the 157 Acre Site and complete the remediation and basic infrastructure before a private developer would agree to build. Early that year, the City created the CRA to acquire the site and complete the remediation. In May 2015, Carson Marketplace transferred its interest in the 157 Acre Site to the CRA, in consideration for, "among other things, the Successor Agency's obligation to ensure the completion of the remediation work and other infrastructure improvements." The City and the Successor Agency "have admitted that, in the context of [plaintiff's] claims, 'the Successor Agency is directly liable . . . for competently undertaking the Remediation Work and alleviating the Hazardous Substances upon the 157 Acre Site.' "

From 2016 through 2018, the City and the CRA negotiated with plaintiff, leading to a series of interconnected agreements (the "project agreements") for the development of 40 acres of the 157 Acre Site, called the "Cell 2 Site." The project was to be "a state-of-the-art, first-class, regional fashion outlet and retail mall." For plaintiff to develop the Cell 2 Site, it was critical that the CRA

---

[1]     The dissolution law "transfers control of redevelopment agency assets to successor agencies, which are contemplated to be the city or county that created the redevelopment agency [citations]. [The law] requires successor agencies to continue to make payments and perform existing obligations." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 251.)

4

and the City first remediate the Cell 2 Site, install infrastructure in the subsurface, construct roads, and much more.

The "project agreements" were executed in September 2018. They included a conveyancing agreement between plaintiff and the CRA (exhibit A to plaintiff's operative complaint); a cooperation agreement between the CRA and the City; and a development agreement between plaintiff and the City.

Under the conveyancing agreement, the CRA must construct the remedial systems at its sole cost. The parties acknowledged development would be financially infeasible without remediation, and the CRA "has substantial funds to do so." The CRA represented it had $75,873,000 as of December 31, 2017. The CRA and the City advised plaintiff the Cell 2 Site remediation would cost $26,888,698.

The CRA was also responsible under the conveyancing agreement to fund and construct, on behalf of the City, certain offsite improvements to serve the 157 Acre Site, such as roadway improvements, water and other utilities, that were prerequisites for building out the project's infrastructure.

Some of the offsite and site development improvements were subject to advances of funds from plaintiff. Plaintiff was entitled to recoup its advances from future tax revenues generated by the project and paid to the City. The CRA could not use plaintiff's advances to fund any remediation work. Plaintiff had the right to approve the CRA's plan for offsite improvements and site development improvements, including any improvement changes.

The cooperation agreement between the CRA and the City required the CRA to report to the City any change orders over a de minimis amount, and in certain cases to obtain plaintiff's approval.

Plaintiff is identified as a third party beneficiary in connection with the project.

The CRA retained RES as its primary contractor. RES was tasked with managing the subcontractors. After completion of remediation of the Cell 2 Site and development improvements, plaintiff would be entitled to develop the site in accordance with rights granted by the City to plaintiff under the development agreement.

## 2. Mismanagement of the Project

The operative complaint describes at length gross mismanagement of the project by the City, the CRA and RES, resulting in the creation of a massive funding deficit and causing damages to plaintiff of over $80 million.

Before work began on the project, plaintiff deposited $4 million with the CRA, a deposit intended "to secure performance under the Conveyancing Agreement." Without plaintiff's knowledge, the City held these funds in its own account. "In connection with the negotiations, and over the next year," plaintiff invested "more than $80 million in connection with the Project."

In October 2019, just a year after the project agreements were signed, the CRA and RES disclosed they did not have the funding to complete the work the CRA was required to complete for the Cell 2 Site. Plaintiff then learned the CRA had not only spent all the funds available for the remediation but also had developed a huge deficit. The City and Successor Agency had failed to provide the necessary funding to cover or cure the shortfall and had taken no action to properly supervise the CRA.

Unbeknownst to plaintiff, the City and the CRA failed to employ a sufficient project management and financial control

6

process. The assistant city manager in charge of the project had no experience managing a major remediation and construction project. The CRA executive director failed to oversee spending on the project. The City and CRA representatives failed to review, scrutinize and approve millions of dollars in change orders. There were no budget forecasts or reports of variances from budget or notification of a significant budget shortfall until it was too late.

These failures "led to massive, unmonitored spending increases with no attention by RES or the City Defendants to baseline cost estimates, a budget, or an analysis to determine if sufficient funds were available." The City and the CRA "have used [plaintiff's] advances to pay for remediation work," contrary to the conveyancing agreement. "As the City Attorney recognized, in writing, there was a 'total and utter failure to manage' by RES," a failure that happened on the CRA's watch.

The CRA did not even know how many tens of millions of dollars were needed to complete the project, "though their numbers have ranged from $40 million to $57 million."

### 3. The Concealment Allegations

The City, the CRA and RES "admit they became aware of an enormous funding shortfall they created as early as February 2019," but concealed the shortfall from plaintiff. The City and the CRA "continued to incur substantial additional costs (including millions of dollars in costs *invoiced to and advanced by [plaintiff]* under the Project Agreements) even though they knew they would not be able to complete their remediation and infrastructure obligations." "The City and the CRA did *nothing* to correct the funding issues or lack of Project oversight, and instead continued to allow RES to mismanage the Project and waste millions of dollars." Defendants "elected to completely deplete available funds

7

for remediation of the Cell 2 Site without notifying [plaintiff] that they were rapidly running out of money."

"Throughout the remainder of 2019," defendants intentionally concealed their funding deficit and "made numerous representations to continue to induce [plaintiff] to advance additional funds," even though they knew they could not complete their obligations under the project agreements. For example, month after month through November 2019, the City's treasurer (also treasurer of the CRA and Successor Agency) represented to the public and the CRA board "that the CRA had enough money to fund its obligations for the next six months," representations that, "[a]s it turns out, . . . were patently false." "There was no advance warning to [plaintiff] or the public of this financial malfeasance." The complaint alleges the city manager, the mayor, the city attorney, the CRA and RES knew the CRA was running out of money and the City and Successor Agency would not provide the required funding, but they did not disclose that information to plaintiff and the public.

On September 25, 2019, RES told the assistant city manager the funding deficit "no longer only precluded the remediation of the entire 157 Acre Site, but was so severe that it even precluded the remediation of the Cell 2 Site." (Italics omitted.) But RES did not tell plaintiff, and neither did the CRA until weeks later. Despite the CRA's "awareness of issues since at least February 2019, it failed to 'take over direct management of the primary contractors' until November 2019." (Italics omitted.)

On October 17, 2019, the CRA began to disclose the truth about its massive financial deficit to plaintiff, but at the same time, "the City Attorney, the CRA, and RES conspired about how to continue to conceal the dire facts from [plaintiff]." On

8

October 31, 2019, the city attorney "brainstormed with RES 'how [to] present the number to [plaintiff].' " (Second brackets added.) The City "tried to find a way to pin the blame on [plaintiff] to 'get [plaintiff] on the defensive.' "

### 4. Events After the CRA's Disclosure

The complaint alleges that on January 30, 2020, plaintiff gave formal notice to the CRA and the City of their material breaches of contract. The CRA failed to cure the defaults, with the city defendants "all *repeatedly* admitt[ing] . . . that the CRA has no ability to cover the funding shortfall they caused or 'to deliver the remedial work.' " The city defendants have admitted plaintiff has been damaged "to the tune of more than $80 million" and must necessarily turn to the Successor Agency and the City for recovery "because the CRA 'has no assets or financial resources' to cover their obligations." The City's mayor "apologized in writing to a senior representative of [plaintiff] for the CRA's failing on the Project." The city defendants, "including the Successor Agency itself, have repeatedly admitted that the Successor Agency has a duty to [plaintiff] to fund the completion of the remedial work, and that Successor Agency breached that duty." (Boldface & italics omitted.)

Plaintiff filed this lawsuit in April 2020 and filed the operative second amended complaint in November 2020. As relevant here, the operative complaint alleges causes of action (1) for breach of contract against the CRA, and against the City and Successor Agency as alter egos of the CRA; and (2) breach of the implied covenant of good faith and fair dealing against the City and the CRA, and against all the city defendants as alter egos. The claim for breach of the covenant of good faith referred to both

9

the conveyancing agreement between plaintiff and the CRA and the development agreement between plaintiff and the City.

**5.      The Alter Ego Allegations**

The complaint summarizes the alter ego relationship among the City, the CRA and the Successor Agency as follows:  "These entities failed to:  (a) observe appropriate formalities; (b) maintain separate records; (c) properly demarcate between when individuals were acting for the City and when those same individuals were acting for the CRA or the Successor Agency; (d) properly memorialize meetings between the CRA, the Successor Agency, City Council, and Project contractors and subcontractors; or (e) properly capitalize the CRA.  Moreover, in light of the City's extensive managerial and administrative control over the CRA and the Successor Agency, their commingling of resources and operations, and the fact that both the CRA and Successor Agency operate exclusively for the benefit of the City, the three entities constitute a single enterprise.  The CRA and the Successor Agency exist largely to complete the remediation work such that the Project can move forward and the City can reap massive financial and societal gains."  We recite the more detailed alter ego allegations below.

> **a.      Disregard of formalities separating the City, the CRA, and the Successor Agency; commingling funds**

The City created and retains direct control over the CRA and operates the Successor Agency.  "Formalities are not respected among the three entities, and the City has the power to, and does, make decisions for all three entities."

The City "has contributed financial resources to [the CRA and the Successor Agency] in connection with the Project and

10

otherwise." In the development agreement between the City and plaintiff, "the parties acknowledge that the 'City caused [the CRA] to be formed and is providing funding to [the CRA].' " (Brackets in original.) Plaintiff's "$4 million deposit under the Conveyancing Agreement was also held by the City, despite the fact that the Conveyancing Agreement provided that the money belonged to the CRA." (Boldface & italics omitted.)

The complaint alleges the three entities' finances "are managed by the same City employee and involve common funds," and the "CRA consults with the City Treasurer regarding where and how to move funds." At the CRA's meetings, which key members of the City attend, "important 'budget' and financial issues on the agendas are routinely passed without any discussion or debate," and "these meetings are not properly memorialized."

"The CRA's and the City's finances are so intertwined that the City's auditors require the City to include the CRA in the City's own consolidated financial statements." The auditors have explained it would be misleading to exclude the CRA from the City's financial statements. The City's assistant city manager "has also admitted, in writing, that '[a]ll of the Successor Agency funding . . . is in the accounts of the CRA.' " The City has "confirmed its historical financial involvement in developing the Site," acknowledging in February 2020 that the City, through its developers including the Successor Agency and the CRA, " 'has caused over $200M to be spent on the Remediation Work.' "

The complaint alleges the City has direct control over the "ultimate decisions related to the Project," such as in the City's development agreement with plaintiff, which states the City's legal authority to regulate the zoning of the site and to approve and modify the general plan and specific plans. Further, the

11

cooperation agreement between the City and the CRA gives the City the right to receive reports of certain change orders and "exercise other oversight over the CRA's actions," and the CRA "is obligated 'to obtain City[] approval of the construction terms and costs.' " A city employee with no formal role at the CRA was "intimately involved in tracking the progress of the Project." The city attorney admitted that " 'nothing gets done going forward on this project without the express consent of the City Attorney's office.' " "City representatives frequently referred to their extensive involvement in the project indicating that 'the City *and* CRA continued to actively pursue the development of the Site.' "

The complaint alleges the City is an intended beneficiary of the relationship between the CRA and plaintiff, and of the Successor Agency's obligations. The City "was a primary beneficiary of the Project from its inception," and City representatives "frequently discussed the 'substantial benefits' the Project would yield specifically *for the City*. For that reason, the Conveyancing Agreement expressly provided that '[t]he City is a third party beneficiary of this Agreement *with the rights of enforcement*." "[T]he City operates the CRA and the Successor Agency as though they are part of one single enterprise designed to promote the City's interests and fulfill one common purpose—the remediation of the 157 Acre Site."

### b. Identical officers and managers

The complaint alleges the three city defendants "use the same individuals, employees, members, and officers to manage and control the activities for all three entities." The mayor is the chair of the Successor Agency and the CRA board. The mayor pro tem is the Successor Agency vice chairman. Under governing CRA documents, the city manager "is appointed to be the Executive

12

Director of the CRA," but has "improperly abdicated that role to the Assistant City Manager . . . without following any appreciable legal formalities." (Italics omitted.)

Members of the city council also serve as members of the Successor Agency. The city manager is executive director of the Successor Agency. The city attorney is also counsel to the Successor Agency and the CRA. The city clerk is secretary for the Successor Agency and CRA. The deputy city clerk is also deputy secretary for the CRA. The city treasurer is also treasurer of the CRA and Successor Agency.

Individuals from the city treasurer's office that had no formal role for the CRA were "intimately involved in managing the finances of the CRA." The City's finance staff "conduct accounting services for the CRA." The employees and officers for the city defendants "routinely have operated with little to no demarcation between when they are acting for the CRA, when they are acting for the Successor Agency, and when they are acting for the City." Meetings of the city defendants "are often held in the same place and on the same day."

### c. City use of CRA and Successor Agency as a conduit for the affairs of the City

The complaint alleges that the CRA is insolvent and undercapitalized. "Despite that the City and the Successor Agency are admittedly responsible for ensuring the CRA remains capitalized (further demonstrating the clear control exerted by the City), the Assistant City Manager has admitted in writing that the CRA 'has no assets or financial resources' to cover the massive funding shortfall and concomitant obligations to [plaintiff] and has conceded that [plaintiff] must 'of necessity turn to the Successor Agency and the City' for recovery." "The City and Successor

13

Agency continue to admit that the CRA is undercapitalized and that they are liable for funding the CRA; despite that, the CRA remains in jeopardy."

The complaint alleges the city "exercised intimate and substantial control over the CRA and the Successor Agency and continues to do so. In particular, the City contributed significant financial resources to the CRA in connection with the Project and otherwise, despite the fact that, due to the CRA's gross mismanagement, the CRA has remained undercapitalized to the point that it was unable to adhere to a standard of care."

Further, "the City created the CRA in an attempt to shield itself from liability while still receiving the primary benefits of the Project, but then failed to properly capitalize or supervise the CRA at all. On information and belief, the City did this specifically so that it could afford to be derelict in its duties and push all liability to the CRA despite the fact that the CRA was managed and operated by the City's own officials."

**6.     The Demurrers and the Trial Court's Ruling**

The City and Successor Agency demurred to the complaint. (The court overruled a demurrer by the CRA to the breach of implied covenant claim.) The trial court sustained the demurrer of the City and Successor Agency as to all causes of action without leave to amend, stating: "There are insufficient allegations for alter ego liability. The City is not party to the contract and cannot be liable for Breach of Implied Covenant." The court entered judgment of dismissal as to the City and the Successor Agency on March 18, 2021.

Plaintiff filed a timely notice of appeal from the court's judgment of dismissal. Plaintiff tells the court that its appeal is "only as to the City."

14

## DISCUSSION

### 1. The Standard of Review

A demurrer tests the legal sufficiency of the complaint. We review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action. For purposes of review, we accept as true all material facts alleged in the complaint, but not contentions, deductions or conclusions of fact or law. We also consider matters that may be judicially noticed. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

### 2. The Issues and the Precedents

The first issue we decide is that the alter ego doctrine may be applied to a government entity in a case where the facts justify an equitable finding of liability. As we will explain, our review of the precedents (see pts. d. & e., *post*) reveals that some California appellate courts have stated that one government entity is the alter ego of another. Other courts have declined to apply the doctrine to governmental entities based on the facts of the case. But we have seen no California decision, nor any sister state or federal court decision applying the law of another state, that held the alter ego doctrine may never be applied to government entities as a matter of law.

The second question is the one presented by every demurrer: whether the facts alleged fail to state a claim as a matter of law. Here, our holding is limited to this: Accepting as true all the material allegations of the second amended complaint, we cannot say as a matter of law that plaintiff will be unable to prove the City is the alter ego of the CRA.

We begin with a summary of alter ego principles as established in corporate law. Then we turn to the application of those principles to government entities, and to the cases applying

15

(or declining to apply) them to government entities.  In so doing, we also explain how the circumstances in cases declining to apply alter ego liability to government entities differ from the facts alleged in this case.

### a.     Traditional alter ego doctrine

The Supreme Court tells us that "[t]he essence of the alter ego doctrine is that justice be done.  'What the formula comes down to, once shorn of verbiage about control, instrumentality, agency, and corporate entity, is that liability is imposed to reach an equitable result.' " (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 301.)

Another court explains:  "The 'single enterprise,' or alter ego, doctrine is an equitable doctrine:  'A corporate identity may be disregarded—the "corporate veil" pierced—where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation.  [Citation.]  Under the alter ego doctrine, then, when the corporate form is used to perpetuate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners.' " (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1341 (*Troyk*).)

" 'In California, two conditions must be met before the alter ego doctrine will be invoked.  First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist.  Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone.' " (*Troyk, supra,* 171 Cal.App.4th at p. 1341.)

16

Alter ego liability "is not limited to the parent-subsidiary corporate relationship; rather, 'under the single-enterprise rule, liability can [also] be found between sister [or affiliated] companies.' " (*Ibid.*)

"Factors for the trial court to consider include the commingling of funds and assets of the two entities, identical equitable ownership in the two entities, use of the same offices and employees, disregard of corporate formalities, identical directors and officers, and use of one as a mere shell or conduit for the affairs of the other. [Citation.] 'No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied.' " (*Troyk, supra,* 171 Cal.App.4th at p. 1342.)

### b. Alter ego doctrine and government entities

Of course, government entities are not privately held corporations. One government entity is not ordinarily "owned" by another, or by anyone. But as long ago as 1931, one treatise on disregarding the corporate entity observed that the principle "is by no means hampered in its application, or confined in its operation to private corporations but will apply with equal force and vigor in proper cases to municipal corporations." (Anderson, Limitations of the Corporate Entity: A Treatise of the Law Relating to the Overriding of the Corporate Fiction (1931) § 68, p. 79.) We agree with that observation. Government entities regularly engage in commercial activities with the private sector, and a government entity may create another government entity to perform certain activities for the purpose of avoiding liability in the creating entity, just as in the private sector. (Here, the conveyancing agreement states the CRA was formed "to take and pursue remediation of the 157 Acre Site," and one of the goals was to protect the City from "any liability which would arise to the landowner.")

17

Under such circumstances, it seems to us that the *equivalent* of "a unity of interest and ownership" may well exist between two or more government entities. The precedents tell us that if private corporations are "operated with integrated resources in pursuit of a single business purpose," and one of them "so dominated the finances, policies and practices of" the other that the latter "had no separate 'mind, will or existence' of [its] own, but [was] merely [a] conduit[]" through which the former conducted its business, then alter ego liability may exist if an inequitable result would otherwise follow. (*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1109 (*Toho-Towa*).) We are unable to see why the same principle should not apply to government entities, if comparable facts are established. It is the "unity of interest" that is significant, and indistinguishable from ownership in any practical way, when public entities are involved.

### c. The City's contentions

The City contends no California court has held one public agency liable for a contractual or financial obligation of another public agency, and the alter ego/single enterprise theory "is a common law doctrine that does not apply to public agencies." Further, the City contends that disclosures made in the recitals in the conveyancing agreement and development agreement, together with the statutory immunity of public agencies in California from liability for fraud, "inexorably lead to the conclusion" that the alter ego theory cannot apply here.

Our review of the authorities the parties cite, discussed *post*, reveals no cases that have held the alter ego doctrine does not apply *as a matter of law* to governmental entities, without regard to the facts. And the City's claim that the disclosures in the

18

recitals prevent the application of alter ego liability does not withstand analysis either, as we now show.

The City first points out the recitals in the conveyancing agreement (attached to plaintiff's complaint) show plaintiff knew the amount of funds available to CRA as of December 31, 2017; knew the CRA was formed to remediate the site because the City was unwilling to put its general fund at risk for environmental cleanup costs then exceeding $100 million; knew the Successor Agency committed to provide $50.5 million in additional required funding to the CRA; knew the City would contract with the CRA to perform the City's infrastructure obligations "to avoid any City liability for the remediation"; and knew the CRA's "resources are insufficient to undertake the Project," and "the [CRA] does not have sufficient funds to pay for the Offsite Improvements and Site Development Improvements" for which it was responsible, resulting in the agreement that plaintiff would advance funds that were to be repaid though sales tax revenues for up to 25 years.

We agree with the City that the recitals do indeed show all this was known to plaintiff when it executed the conveyancing agreement. But we do not agree with the City's contention that these recitals show "[t]here were no surprises here, no concealment, and therefore no basis for holding the City and the Successor Agency liable on an alter ego/single enterprise theory, because the element of fraud, concealment, bad faith or injustice is completely absent." We disagree with the City on this point for multiple reasons.

First, the question is not confined to what plaintiff knew when it executed the agreement; the more pertinent point is what the City and the CRA did thereafter. The complaint clearly alleges failure to observe appropriate formalities and maintain separate

19

records, failure to properly capitalize the CRA, and so on, as well as that "[t]hroughout the remainder of 2019," defendants intentionally concealed their funding deficit and "made numerous representations to continue to induce [plaintiff] to advance additional funds," even though they knew they could not complete their obligations under the project agreements.

Second, plaintiff need not allege a claim for fraud in order to establish alter ego liability. "The alter ego doctrine does not require proof of fraud, and can be satisfied by evidence that adherence to the fiction of the separate existence of the corporation would promote injustice." (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1069, 1074; accord, *Claremont Press Publishing Co., Inc. v. Barksdale* (1960) 187 Cal.App.2d 813, 817 ["actual fraud need not be shown. It is sufficient that refusal to recognize unity of corporation and individual 'will bring about inequitable results' "].)

Third, on the allegations of the complaint, we cannot agree that "concealment, bad faith or injustice is completely absent." The complaint alleges the City created the CRA for its own benefit, was derelict in its oversight of the project, and concealed the project's mismanagement and undercapitalization from plaintiff for the better part of a year, all while plaintiff was investing tens of millions of dollars in connection with the project. The complaint alleges that, "despite awareness of the CRA's insolvency, the City defendants continued to make commitments to [plaintiff] that the CRA could complete its contractual duties, despite knowing full well that the CRA lacked the funds to be able to do so." If those allegations are proved, a court might conclude an "inequitable result" would follow if the CRA is treated as a separate entity.

Fourth, the City argues that judicially noticeable documents demonstrate the city defendants "are separate entities existing

20

under different bodies of law with different powers and duties." The City recites information from the city charter, the law creating and governing successor agencies, and the documents establishing the CRA as a joint powers authority. Of course it is true that the City exists as a separate legal entity from the CRA. But in *every* single enterprise alter ego case, there are always two or more formally separate defendants who the plaintiff alleges should be deemed one and the same under equitable principles, not under statutory law. We see no reason these principles should be different when government entities are involved.

The City insists that not all legal concepts apply to public agencies in the same way they apply to private entities, "in order to protect the public fisc," citing differences in the application of the law on oral contracts, quantum meruit, and other areas of law. The City argues that a judgment for tens of millions of dollars would cripple the City financially, stripping its residents of necessary services affecting public health and safety, and these potential risks "warrant rejection of alter ego/single enterprise liability." We are not persuaded that potential risks to the public fisc weigh so heavily in balancing the equities as to justify categorically barring municipal liability if plaintiff can prove malfeasance of the kind and in the circumstances alleged in the complaint.

That brings us to the precedents.

### d.     The precedents:  California

As we have observed, several cases have stated that one government agency is the alter ego of another, albeit without analysis of the alter ego doctrine. For example, in *Nolan v. Redevelopment Agency* (1981) 117 Cal.App.3d 494, 499–501, a redevelopment agency was named as the defendant, while the city,

which had declared itself to be the redevelopment agency as authorized by statute (and which was an indispensable party), was not named as a defendant.  The Court of Appeal reversed the trial court's dismissal of the case, observing that "the problem of parties . . . turns out to be only a phantom.  The city council is the redevelopment agency. . . .  The council, albeit referred to by its other title, has been a party defendant in this action from the beginning."  (*Id.* at p. 501.)  Similarly, in *Oceanside Marina Towers Assn. v. Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735, a case involving the filing of a notice that started the statute of limitation, the court stated that a community development commission "is the Oceanside City Council and acts as the alter ego of the City."  (*Id.* at p. 741; *id.* at p. 738 [the city council itself constituted the commission, which used city personnel and staff services exclusively; "[i]n essence, then, the Commission is the alter ego of the City for redevelopment purposes"].)

Plaintiff cites other cases that have disagreed with *Nolan,* particularly relying on *Pacific States Enterprises v. City of Coachella* (1993) 13 Cal.App.4th 1414 (*Pacific States Enterprises*).  But these cases do not help plaintiff, because they are based on the principle that "the mere fact that the same body of officers acts as the legislative body of two different governmental entities does *not* mean that the two different governmental entities are, in actuality, one and the same."  (*Id.* at p. 1424.)  We recognize that principle, and that it applies in this case.  But the complaint in this case alleges a great deal more than "the mere fact" that the same body of officers acts as the legislative body for two different agencies.  (See pt. 5 of the Facts, *ante.*)

22

*Pacific States Enterprises* involved breach of an oral contract, where the plaintiff argued the city and the redevelopment agency were "one and the same governmental entity" so that the "allegations as to one have full force and effect as to the other." (*Pacific States Enterprises, supra,* 13 Cal.App.4th at pp. 1422–1423.) The Court of Appeal observed that "[w]hen a 'dual capacity legislative body' acts as the governing board of a redevelopment agency, it is the redevelopment agency which is acting by and through that legislative body; and when that same legislative body acts as the governing body of the 'community' (i.e., city) over which it exercises local governmental powers, it is the 'community' which is acting by and through that legislative body. The redevelopment agency and the 'community' are *not* one and the same governmental entity." (*Id.* at p. 1425.)

The City contends plaintiff here "seeks to do . . . precisely what the Court of Appeal in *Pacific States Enterprises* rejected." That is plainly not so. For one thing, plaintiff does not claim the City and the CRA are "one and the same government entity." Plaintiff specifically alleges the formal distinctions among the City, the CRA and the Successor Agency and recites at length facts which, if proven, might justify a court ignoring their legal separateness on equitable grounds.

Other cases the City cites are similar. *Macy v. City of Fontana* (2016) 244 Cal.App.4th 1421 merely held that a redevelopment agency and a municipality "may, as here, have the same governing body; however, given their separate identities and liabilities, the statutory duties imposed on the [redevelopment agency] may not be ascribed to the municipality." (*Id.* at p. 1430.) *Macy* does not even discuss alter ego doctrine.

23

The same is true of *Vanoni v. County of Sonoma* (1974) 40 Cal.App.3d 743, where the plaintiffs argued that a flood district was indistinguishable from the County of Sonoma for purposes of the constitutional debt limitation. (*Id.* at p. 748.) The court held the fact that the same individuals were members of both governing boards was insufficient to show the county exercised actual control over the actions of the district. (*Id.* at p. 750.) The constitutional limitation on county indebtedness did not apply to the indebtedness of the district because the county "neither assumed any obligation for the district's contractual obligation to the United States nor controlled the district's decision to incur that obligation." (*Id.* at pp. 750–751.) Again, we fail to see how the *Vanoni* circumstances are in any way "similar[]" to the allegations in this case (where, for one thing, the City's control of the CRA is extensively alleged).

*San Diegans for Open Government v. City of San Diego* (2015) 242 Cal.App.4th 416 is another debt limitation case, where the court found debt limitation provisions applicable to the city did not apply to a separate public financing authority that was formed under a joint powers agreement. (*Id.* at p. 424.) The court rejected the argument that the financing authority was a " 'subordinate agency' " of the city, with the same governing boards and other officers (*id.* at p. 436), and emphasized the financing authority's " 'genuine separate existence' " from the city, as established in various statutes (*id.* at p. 438). Again, *San Diegans* involves no analysis of the alter ego doctrine. And plaintiff here alleges much more than just overlap of governing boards and officers. Again, the issue here is whether formally separate defendants should be deemed one and the same under equitable principles, not under statutory law.

24

Still other cases discuss alter ego doctrine but find it does not apply on the particular facts of the case. For example, in *Rider v. County of San Diego* (1992) 11 Cal.App.4th 1410, the court rejected a claim that a regional justice facility financing agency was the alter ego of the county, justifying holding the county liable for the agency's debts. (*Id.* at pp. 1424–1425.) But the reason for the court's rejection was the absence of any inequity. Both county and agency acted in good faith, and neither the county nor the agency engaged in an abuse or a perversion of legislative privilege. (*Id.* at p. 1425.) "Consequently, equity does not demand that the County be held derivatively liable for the Agency's debts and liabilities." (*Ibid.*)

Likewise, in *Tucker Land Co. v. State of California* (2001) 94 Cal.App.4th 1191, the court held the members of a joint powers agency were not liable as alter egos for the agency's contractual obligations. (*Id.* at p. 1201.) The court found "no evidence of abuse of organizational formalities, or of any diversion of funds. There is no evidence that any fraud was perpetrated on [the plaintiff]." (*Id.* at p. 1202.) Again, although plaintiff here does not allege fraud, the complaint alleges organizational formalities were ignored, CRA funds were placed in city accounts, failure to properly capitalize CRA, concealment of the massive deficit, and more.

Finally, the City tries to distinguish a federal district court case in California that found alter ego allegations were sufficient to survive a motion to dismiss. In *Axon Solutions, Inc. v. San Diego Data Processing Corp.* (S.D.Cal. May 4, 2010, No. 09 CV 2543 JM (RBB)) 2010 U.S. Dist. Lexis 43390 (*Axon*), the court found, as relevant here, that the plaintiff—who sued on a contract with a nonprofit corporation wholly owned by the city—sufficiently

25

pled that the city was the alter ego of the nonprofit corporation. (*Id.* at pp. *2, 8.)

After describing factors to be considered in applying alter ego doctrine under California law, the *Axon* court said: "[The plaintiff's] complaint contains factual allegations directed at these factors. Specifically, [the plaintiff] alleges the City deliberately undercapitalized SDDPC [the publicly owned nonprofit], the City and SDDPC commingle funds, and the City has represented that it is liable for SDDPCs' debts. . . . Furthermore, [the plaintiff] alleges that the City intends to dissolve SDDPC so that the City can 'wrongfully avoid liability for the monies owed to [the plaintiff].' . . . . Difficulty in enforcing a judgment or collecting a debt does not satisfy[] the requirement of an inequitable act. [Citation.] Here, however, the City would have the power to destroy any remedy available to [the plaintiff], from either the City or SDDPC, if it dissolved SDDPC. This rises to the level of an inequitable act for purposes of alter ego doctrine at the pleading stage. Therefore, [the plaintiff's] alter ego allegations are sufficient to survive the City's motion to dismiss." (*Axon, supra,* 2010 U.S. Dist. Lexis 43390, at pp. *7–8.)

The City tries to distinguish *Axon* by pointing to facts that are different from the facts alleged in this case (such as that there "is no 'corporation' involved for the City to threaten to dissolve"). But the facts of cases are always different, and the absence of any corporation in this case is a distinction without a difference. Many of the allegations in *Axon* are comparable to the allegations in this case, and the point is that the court applied California law and the alter ego doctrine to a case involving two government entities.

26

### e.    The precedents:  other jurisdictions

The City tells us that "[e]very jurisdiction in the United States that has considered . . . application [of the alter ego/single enterprise doctrine] to public agencies has rejected it."  But the City fails to mention significant differences in the allegations and the rationales in the cases it cites.

The City relies principally on *Foster Wheeler Energy Corp. v. Metropolitan Knox Solid Waste Authority, Inc.* (6th Cir. 1992) 970 F.2d 199.  There, the Sixth Circuit ordered the dismissal of a complaint alleging a Tennessee city and county were liable for contractual obligations of the Waste Authority, a nonprofit corporation created by the city and county.  (*Id.* at p. 200.)  The court reasoned that the city and county "were not equity owners in the Waste Authority, as the project was financed with revenue bonds," and the fact that the city and county placed directors on the Waste Authority's board, "and agreed to cooperate and use their best efforts to make the Waste Authority succeed, does not, in our view, create a sufficient nexus between the city, the county and the Waste Authority on which to predicate liability."  (*Id.* at p. 203.)  The court expressed its reluctance "to extend the corporate veil theory to the present set of facts absent more specific guidance from the Tennessee courts."  (*Ibid.*)  Further, the court understood the corporate veil theory, under Tennessee law, "to apply primarily to prevent fraud or other tortious wrongdoing," and there were no such allegations.  (*Ibid.*)

*Foster Wheeler* does not help the City for the simple reason that, unlike this case, in *Foster Wheeler* there were no allegations of wrongdoing or an inequitable or unjust result—a fundamental requirement for the application of alter ego doctrine.  There are

27

such allegations here, as we have described above.  The City simply downplays or ignores those allegations.

The same reasons, among others, distinguish *McDaniel v. Board of Education* (N.D.Ill. 2013) 956 F.Supp.2d 887, where the plaintiffs sought to hold the city responsible for school closings by the board of education under alter ego principles (*id.* at pp. 895–896), and the court found the doctrine "ill-suited to these circumstances" (*id.* at p. 897).  In *McDaniel,* again, there were no allegations of an inequitable result if alter ego doctrine were not applied.  There were no allegations "that the Board and the City are commingling funds or failing to maintain corporate formalities, or that the City is attempting to use the Board to perpetrate a fraud upon Plaintiffs (or why it would even try to do so)." (*Id.* at p. 898.)  The court also referred to the "general reluctance of Illinois courts to engage in veil piercing" (*ibid.*).  In California, while "[a]lter ego is an extreme remedy, sparingly used" (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539), we see no reluctance by California courts to invoke the doctrine where the allegations, if true, would support it.

Finally, the City cites a Pennsylvania case where the Commonwealth Court found the doctrine of piercing the corporate veil was "wholly inapplicable" to the relationship between redevelopment authorities and municipalities.  (*Newcrete Products v. City of Wilkes-Barre* (Pa. Cmwlth. Ct. 2012) 37 A.3d 7, 13.)  This was because "a redevelopment authority is not authorized to sell ownership interests, [so] City is not capable of being an equity interest holder in Authority, and thus, City cannot be liable for Authority's debts by veil piercing." (*Id.* at pp. 13–14.)  As we have already stated, the ownership principle is inapt in the context of public entities, and we do not consider that a legal bar to

28

application of the alter ego doctrine. (See *ante,* at pp. 17–18.) Moreover, California courts have stated, in other factual circumstances, that "the 'ownership' element of the alter ego doctrine is not applicable in this context." (*Tran v. Farmers Group, Inc.* (2002) 104 Cal.App.4th 1202, 1219, fn. 7 [an interinsurance exchange]; see also *Troyk, supra,* 171 Cal.App.4th at p. 1343 & fn. 27 [defendant insurer "did not need to own [defendant insurance exchange] for application of the alter ego or single enterprise doctrine," citing *Tran*].)

To summarize, none of the cases just described supports the notion that the alter ego doctrine may not be applied to a public agency *as a matter of law*. The City returns again and again to the fact that the city defendants "all exist by virtue of different bodies of law," and that their separate roles and obligations were disclosed to plaintiff in the project agreements. What the City does not do is explain, in light of the allegations in the complaint, why that supports its conclusion plaintiff "cannot claim . . . that it would be unjust to recognize the separateness of the public agencies."

The complaint alleges facts that, if proved, would allow a court to conclude that, so far as the development of the site was concerned, the City and the CRA "were operated with integrated resources in pursuit of a single business purpose" and that the City "so dominated the finances, policies and practices" of the CRA that the CRA "had no separate 'mind, will or existence' of [its] own, but [was] merely [a] conduit[] through which" the City conducted its business. (See *Toho-Towa, supra,* 217 Cal.App.4th at p. 1109.) The complaint likewise alleges facts that, if proved, would allow a court to conclude an inequitable result would follow if the acts in question are treated as those of the CRA alone. We find the

29

allegations in plaintiff's complaint sufficient to survive the City's demurrer.

### 3.     The Breach of Implied Covenant Claim

The covenant of good faith and fair dealing " 'not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose.' " (*Pasadena Live, LLC v. City of Pasadena* (2004) 114 Cal.App.4th 1089, 1093.)

Here, the trial court sustained the City's demurrer to plaintiff's claim for breach of the implied covenant of good faith and fair dealing, stating the City was "not party to the contract" and therefore could not be liable for breach of the implied covenant. Because we find plaintiff has sufficiently alleged a breach of contract claim under the alter ego doctrine, it follows that the City could be liable for breach of the implied covenant on the same basis.

In addition, plaintiff contends that one of the contracts underlying its cause of action for breach of the implied covenant is the development agreement between plaintiff and the City. The complaint alleges that after the CRA's remediation of the site, the parties agreed plaintiff would be entitled to develop the site "in accordance with the rights granted by the City under the Development Agreement," and alleges the City's exercise of direct control over the project pursuant to the development agreement. The development agreement is described in the conveyancing agreement as "granting and vesting the Entitlements for the Project and setting forth certain agreements between [plaintiff] and the City regarding project development."

30

In its cause of action for breach of the implied covenant, plaintiff alleges that "[t]hrough the Development Agreement, . . . the City granted rights to [plaintiff] to develop the Cell 2 Site and provided [plaintiff] with the 'assurance' it could 'complete and utilize the Project.' " The complaint alleges the development agreement obligates the city " 'to perform the Infrastructure Obligations,' " and that the City's duties under the development agreement include financial obligations to pay sales tax revenues to the CRA that were in turn to be provided to plaintiff to repay it for the millions of dollars plaintiff advanced to the CRA. "Because of the City's failure to properly capitalize the CRA, thus making the Project impossible to complete, [plaintiff] is unable to develop the Cell 2 Site and recoup its investments as it is plainly entitled under the Development Agreement. The City's misconduct has prohibited [plaintiff] from taking advantage of the rights it bargained for under the Development Agreement."

The complaint alleges the CRA and the City "each breached the implied covenant of good faith and fair dealing inherent in the Project Agreements"—which include the development agreement—in several specified respects, all of which have already been recited in this opinion in connection with the conveyancing agreement. When the trial court stated the City was "not a party to the contract," it apparently failed to consider plaintiff's allegations concerning the development agreement, to which the City is a party. For this additional reason, the trial court erred in sustaining the City's demurrer to plaintiff's claim for breach of the implied covenant.

## DISPOSITION

The judgment of dismissal is reversed, and the cause is remanded to the trial court with directions to vacate its order sustaining the City's demurrer and to enter a new order overruling the demurrer.  Plaintiff shall recover its costs on appeal.


GRIMES, Acting P. J.

WE CONCUR:


WILEY, J.


HARUTUNIAN, J.[*]

---

[*]     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.